```
1              IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2
    DAVID KNIGHT                    )
3                        Plaintiff )
                                    )
4                 vs                ) No: 03-410 Erie
                                    )
5   BUILDING MATERIALS CORPORATION)
    OF AMERICA, D/B/A GAF           )
6   MATERIALS CORPORATION AND       )
    JOE RINDERLE                    )
7                       Defendants)

8

9             Deposition of DAVID KNIGHT, taken before and

10       by Linda K. Rogers, Commissioner of Deeds in the

11       Commonwealth of Pennsylvania and Notary Public in

12       the State of New York, on Tuesday, March 29, 2005,

13       commencing at 9:30 a.m., at the law offices of

14       MacDonald, Illig, Jones & Britton, 100 State

15       Street, Suite 700, Erie, Pennsylvania.

16

17  For the Plaintiff:

18       Timothy D. McNair, Esquire
         821 State Street
19       Erie, Pennsylvania 16501

20

21  For the Defendants:

22       Lisa Smith Beck,Esquire
         MacDonald Illig Jones & Britton, LLP
23       100 State Street
         Suite 700
24       Erie, Pennsylvania 16507

25                         *    *    *
```

1          D A V I D   K N I G H T, first having

2      been duly sworn, testified as follows:

3

4                      DIRECT EXAMINATION

5   BY MS. BECK:

6

7      Q.   Mr. Knight, we have been introduced before.  My

8   name is Lisa Beck, and I think you know I represent GAF

9   Materials in a lawsuit that you filed against it in the

10  United States District Court for the Western District of

11  Pennsylvania.  We are here to take your deposition today.

12          I have a few preliminary instructions.  If you do

13  not hear or understand any of my questions, just let me know

14  and I will be happy to restate it or rephrase it.  Okay?

15      A.   (Witness moved head up and down.)

16      Q.   Also, all of your responses need to be verbal.

17  You and I are already nodding our heads, but that is

18  something the court reporter can't take down so we'll need

19  you to be sure you verbalize your responses.  Okay?

20      A.   Yeah.

21      Q.   If you need a break at any time, speak with your

22  counsel, just let me know.  Okay?

23      A.   Okay.

24      Q.   And try to wait until I complete my question to

25  provide your answer so that we're not speaking at the same

1    time, again, for the court reporter purposes.  All right?

2        A.   Yes.

3        Q.   Your complete name and address, sir.

4        A.   David Haskell Knight, 713 East 18th Street, Erie,

5    Pennsylvania, 16503.

6        Q.   Your date of birth, Mr. Knight?

7        A.   January 29, 1963.

8        Q.   How long have you been at that address,

9    Mr. Knight?

10       A.   Nearly a year.

11       Q.   We are in March of 2005, so back to the spring of

12   2004?

13       A.   Yes.

14       Q.   Prior to that where did you reside?

15       A.   11682 Route 97, Waterford, PA.

16       Q.   And how long were you at the Waterford address?

17       A.   Eighteen years.

18       Q.   Let me back up a little bit.  Your address

19   currently, sir, is that a home you own or an apartment you

20   rent?

21       A.   My brother's house.

22       Q.   With whom do you currently reside there?

23       A.   My brother.

24       Q.   What is his name?

25       A.   Robert.

1    Q.    Knight?

2    A.    Yes.

3    Q.    The Waterford address, was that a home you owned

4    or own?

5    A.    Yes, mobile home.

6    Q.    Who resided there when you did?

7    A.    I did.

8    Q.    Just yourself?

9    A.    My kids on the weekends.

10    Q.    Any residences between the Waterford address and

11    your current address, sir?

12    A.    No.

13    Q.    Is there a period of time in between those times

14    where you didn't reside anywhere or you moved immediately

15    from Waterford to the Erie address?

16    A.    What do you mean didn't reside anywhere?

17    Q.    Did you live out of town?

18    A.    No.

19    Q.    Or were you homeless at any time, anything like

20    that?

21    A.    Never was homeless.

22    Q.    It was a direct, immediate move?

23    A.    Yes.

24    Q.    The Waterford address, how did you receive mail

25    there?

1      A.    At a mailbox.

2      Q.    You had a mailbox at the home?

3      A.    Yes.

4      Q.    It wasn't a post office box?

5      A.    No.

6      Q.    And currently your Erie address do you have a

7  mailbox or post office box?

8      A.    Mailbox.

9      Q.    You made reference to your children, are you

10  married or were you married?

11     A.    Was married.

12     Q.    Are you divorced currently?

13     A.    Yes.

14     Q.    Her name please?

15     A.    Mary F. Knight.

16     Q.    When did you divorce, Mr. Knight?

17     A.    In '95.

18     Q.    Here in Erie County?

19     A.    Yes.

20     Q.    Does she still reside in Erie County?

21     A.    Yes.

22     Q.    Your children, how many children do you have?

23     A.    Five.

24     Q.    Their names and ages?

25     A.    D████, 17; Z███, 15; F████████, 13; M███ is 11; and

1    L⬛⬛ is 9.  I have another child, but not from that

2    marriage.

3        Q.    What is his or her name?

4        A.    W⬛⬛⬛⬛.

5        Q.    W⬛⬛⬛ Knight?

6        A.    Yes.

7        Q.    How old is W⬛⬛⬛?

8        A.    Two.

9        Q.    Little one?

10       A.    Yes.

11       Q.    Any other marriages, Mr. Knight?

12       A.    No.

13       Q.    Can you tell me a little bit about your

14    educational background.  I understand you attended high

15    school at Cathedral Prep in Erie?

16       A.    Yes.

17       Q.    What year did you graduate?

18       A.    '81.

19       Q.    Did you grow up for the most part in Erie?

20       A.    Yes, I did.

21       Q.    After high school graduation in 1981 what did you

22    do?

23       A.    I went to Gannon.

24       Q.    I understand you attended there for two years?

25       A.    Yes.

1    Q.    Did you obtain any degree?

2    A.    No.

3    Q.    What did you study?

4    A.    Computer science.

5    Q.    Any vocational training or other education after

6    you left Gannon?

7    A.    CNC lathe programming from Vo-Tech.

8    Q.    I am sorry, what kind of programming?

9    A.    CNC lathe programming.

10   Q.    Can you tell me what that is, C and C?

11   A.    CNC, it's just a machine that makes parts, small

12   parts.

13   Q.    Oh, all right.

14   A.    Small engine repair, which would be diesel and gas

15   for the Marine Corps.  That's all I can remember right now.

16   Q.    That was at Vo-Tech locally?

17   A.    Vo-Tech was the CNC lathe programming.  Small

18   engine mechanic and diesel and gas was through the Marine

19   Corps which was from Camp Lejeune, and that's where I got

20   driving too.

21   Q.    Did you have any certifications or licenses as a

22   result of this training?

23   A.    Yes.  Certified CNC lathe programming.  I had

24   transportation tech, they had a driver's school up there

25   too.

1      Q.   Again, any vocational licenses?

2      A.   Licenses, CDL license from Triangle -- I mean

3   transportation tech, CNC lathe programming, certification of

4   CNC lathe programming from Vo-Tech.

5      Q.   Your CDL --

6      A.   Yes.

7      Q.   -- is that still current?

8      A.   Yes.

9      Q.   Those are good for a certain period of time; am I

10  right?

11     A.   Yeah, just like a driver's license.

12     Q.   You have to renew?

13     A.   Yes.

14     Q.   Yours remains current?

15     A.   Yes.

16     Q.   Now, I understand, and you made reference already

17  too, that you were in the military for a while; is that

18  right?

19     A.   Yes.

20     Q.   United States Marine Corps?

21     A.   Yes.

22     Q.   Do you remember, can you tell me when that would

23  have been, Mr. Knight?

24     A.   When I was in the Marine Corps?

25     Q.   Yes.

1       A.    1982 to 1995.

2       Q.    Everyone always remembers the exact date of their

3   military service.  Where were you stationed, sir?

4       A.    I was a reservist here in Erie.  I was stationed

5   all over the place basically for training and other things.

6       Q.    When you began in 1982 with the Marine Corps, was

7   it as a reservist or were you full-time?

8       A.    Yes.

9       Q.    As a reservist?

10      A.    Yeah.

11      Q.    That is when, from what I can see, you were still

12  attending Gannon?

13      A.    Um, that's right after I got done with Gannon,

14  yeah.

15      Q.    You graduated high school in --

16      A.    '81 and then '82 -- it was '81 when I graduated.

17  I went one year and the end of that year is when I went --

18  actually the very end of '82 is when I went and joined the

19  Marine Corps.  The way you joined the Marine Corps back then

20  was you could join then and you wouldn't have to deploy for

21  another six months.  So it looks like you actually joined in

22  '82, but you actually don't leave until the following year

23  and it was good credit toward your retirement or whatever

24  when it came to that.

25      Q.    You did deploy at some point with the Marine

1    Corps?

2         A.    Yes.

3         Q.    You served until 1995?

4         A.    Yes.

5         Q.    What rank did you obtain?

6         A.    Sergeant.

7         Q.    Were you honorably discharged?

8         A.    Yes.

9         Q.    Why did you leave the Marine Corps at that point?

10        A.    I felt I needed to get out at the time.

11        Q.    I understand thereafter that you worked at the

12   U. S. Marshall's office; is that correct?

13        A.    Yes, I did work at the U. S. Marshall's office.

14        Q.    Okay.  What did you do there?

15        A.    Guard.

16        Q.    How long were you there?

17        A.    Couple years.

18        Q.    Was that right after the Marine Corps?

19        A.    Actually, yes, it would have been right after the

20   Marine Corps, in that area.

21        Q.    And you left there, I understand, and I am

22   referring to the employment history that is attached to your

23   application for employment with Transportation Unlimited

24   that your counsel placed in front of you?

25        A.    Right.

1      Q.    Is this your handwriting, sir?

2      A.    Yes.

3      Q.    I thought this might shortcut the process for us.

4   Prior to the U. S. Marine Corps, and when you were attending

5   Gannon, did you have any employment?

6      A.    When I was attending Gannon?

7      Q.    Yes.

8      A.    I was working at Super Duper.

9      Q.    Part-time job?

10     A.    Yes.

11     Q.    Then the U. S. Marine Corps and thereafter the

12  U. S. Marshall's office; is that right?

13     A.    The county prisons is in there.

14     Q.    Okay.  I see that above as listed from -- you are

15  right, these are not sequential, '86 to '95; does that sound

16  right?

17     A.    Yes.

18     Q.    You came out of the U. S Marine Corps and you went

19  to work for Erie County Prison?

20     A.    I was actually working for the county prison at

21  the same time I was in the Marine Corps.  I was a reservist.

22     Q.    What did you do at the county prison?

23     A.    Prison guard.

24     Q.    And from this list that looks to be about nine

25  years?

1        A.    It's about ten years, eight years in the county

2    and two years at Albion.

3        Q.    I think that's listed just above that separately

4    here from '95 to '97 Albion State Prison.

5        A.    Right.

6        Q.    Were you a guard there as well?

7        A.    Yes.

8        Q.    And were you working two jobs from '95 -- '92 to

9    '95?  I see that you were at the U. S. Marshall's office

10    from '92 to '95.

11        A.    Yeah.

12        Q.    So that was an evening position or a weekend

13    position, how did that work?

14        A.    It was as he called us up.  There were several

15    people that did it.  He considered us guards, and as he

16    called us up we would go and help him transport an inmate or

17    need fire power at a hearing or something, federal.

18        Q.    For the federal, okay.  So the U. S. Marshall's

19    office position was a part-time as needed position?

20        A.    Yes.

21        Q.    Is that fair?

22        A.    Yes.

23        Q.    Did you have any training to be a guard or

24    correctional officer?

25        A.    Yes.

1      Q.    Where was that training?

2      A.    Elizabethtown, Pennsylvania.

3      Q.    In connection with any of your employment?

4      A.    Once you got hired at the prison you had to go

5    down to Elizabethtown for six weeks or four weeks for

6    training.

7      Q.    Then you left the state prison; is that right?

8      A.    Yes.

9      Q.    Why is that?

10     A.    Actually I had personal problems that I left the

11    state prison.

12     Q.    I note that it says you were suspended?

13     A.    (Witness moved head up and down.)

14     Q.    Were you discharged from that job?

15     A.    I was suspended, but I wasn't discharged.  It had

16    nothing to do with work, the reason I left.

17     Q.    Were you supposed to return to work there?

18     A.    No.

19     Q.    The suspension was permanent?

20     A.    Yes.

21     Q.    What was the basis for your suspension?

22     A.    I had charges.

23     Q.    Criminal charges?

24     A.    Yes.

25     Q.    I note you worked then for or with Infinity

1     Resources --

2          A.    Um-hmm.

3          Q.    -- thereafter.  That is an employment agency or

4     employment placement agency?

5          A.    Yes.

6          Q.    What kind of work did you do for Infinity?

7          A.    Press punch, run the machine.

8          Q.    You were placed in different places?

9          A.    No, I stayed at the same spot.

10         Q.    Where was that?

11         A.    I always get it screwed up, three letters, it

12    almost sounds like GAF, but it isn't.  I can't think of the

13    name of it.  It's over on Pittsburgh Avenue, 16th and

14    Pittsburgh.

15         Q.    You were there for about a year?

16         A.    Yes.

17         Q.    And why did you leave Infinity?

18         A.    I just changed jobs.

19         Q.    Is that when you went to Dunlap Trucking?

20         A.    Yes.

21         Q.    Again, taking a look at this summary at least has

22    you there from June of '99 till the date this was filled out

23    which was March of 2000?

24         A.    Yes.

25         Q.    And why did you leave Dunlap then and apply at

1    TU -- Transportation Unlimited?

2        A.    I didn't apply at Transportation Unlimited.    I

3    applied at GAF, and left there because I heard they were

4    hiring, it was a little better benefits and better stuff

5    going on.

6        Q.    Better job?

7        A.    Yes.

8        Q.    I understand then that you worked, and we'll talk

9    a lot more about that, either for Transportation Unlimited

10   or for GAF and assigned to the GAF MC plant here in Erie

11   from that spring of 2000 until June of 2002, June or July of

12   2002; is that correct?

13       A.    Yes.

14       Q.    Thereafter, what employment had you had?

15       A.    I worked for Railco Trucking and I'm working for

16   Cycle City presently.

17       Q.    I understand you started with Railco Trucking

18   September 2002?

19       A.    Yes.

20       Q.    So you were off work there for approximately two

21   months?

22       A.    Something like that, June, July, August,

23   September, I think it was more like three months the way the

24   dates fell.

25       Q.    You worked through June?

```
 1        A.    June 26, right.

 2        Q.    Okay.  You were off July, August and you started

 3   sometime in September at Railco?

 4        A.    Yes.

 5        Q.    Did you have any employment in that two to three

 6   month period?

 7        A.    Employment, no.

 8        Q.    Did you do any work for compensation during that

 9   two to three-month period?

10        A.    No, I tried, couldn't find anything.

11        Q.    Now, Railco is up in New York, did I see?

12        A.    Lockport.

13        Q.    Lockport.  What did you do for them?

14        A.    Drive.

15        Q.    Using your CDL as a commercial driver?

16        A.    Yes.

17        Q.    What do they do?

18        A.    Transport G.M. and ALCOA materials.

19        Q.    Is that a full-time position?

20        A.    Yes, it was.

21        Q.    How long were you there?

22        A.    A little over a year, closer to two maybe.  I

23   think it was going on two years.

24        Q.    So till some time perhaps summer, fall of 2004?

25        A.    Yes -- no, 2003.
```

1       Q.   You started there in September 2002?

2       A.   So it would be 2002, 2003, it was going towards a

3    second year, so -- trying to think to give you an answer.

4       Q.   Your best recollection is fine, Mr. Knight -- at

5    some point?

6       A.   2003, yeah.  I think toward the end of 2003, yeah.

7       Q.   And why did that employment discontinue?

8       A.   I was running back and forth to Texas, I wasn't

9    seeing my family.

10      Q.   There were very long drives involved?

11      A.   Yes, 4,000 miles a week.

12      Q.   Did you quit that job?

13      A.   Yes.

14      Q.   And what were you making for Railco Trucking?

15      A.   $.31 a mile, .32 a mile.

16      Q.   Any hourly wage?

17      A.   No.

18      Q.   Just paid by the mile?

19      A.   That's it.

20      Q.   Did you have benefits through Railco?

21      A.   It's very expensive benefits.

22      Q.   Did you have benefits through them?

23      A.   Yes.  Not through them, you had to pay for them.

24   So actually it was by your choice, it wasn't something that

25   just was offered to you, it was by your choice.

1      Q.    Are you telling me the that the employee had to

2   make a contribution toward the cost of the benefits?

3      A.    Substantial.

4      Q.    So that's a yes?

5      A.    Yes.

6      Q.    The benefits, was there an employer contribution

7   toward the benefits?

8      A.    What happened was because we were Pennsylvania and

9   they were New York State it made us, the people that lived

10  in Pennsylvania, way more expensive for insurance.  So we

11  had to -- like they would give us the name that we had to go

12  to for our insurance, but it was like ridiculously priced.

13     Q.    What was that name?

14     A.    The insurance company?

15     Q.    Is that what you are telling me?

16     A.    Yes.  I don't recall who the insurance company

17  was.

18     Q.    Let me go back.  Mr. Knight, is your ex-wife

19  employed?

20     A.    Yes.

21     Q.    Out of the home?  What does she do?

22     A.    Prison guard.  She's actually a counselor now.

23     Q.    Where is that?

24     A.    Erie County Prison.

25     Q.    Does her employment provide for benefits for your

1    children?

2         A.    Does hers presently?  Yes.

3         Q.    That's, of course, the five children you share

4    with her?

5         A.    Yes.

6         Q.    Walter Knight, your two-year old son, what is his

7    mother's name, please?

8         A.    Michelle Salmon.

9         Q.    Can you spell her last name?

10        A.    S-A-L-M-O-N.

11        Q.    Is she employed outside of the home?

12        A.    No.

13        Q.    Are there any benefits provided through your

14   current employment for Walter?

15        A.    Yes.

16        Q.    And your current employment is at Cycle City?

17        A.    Yes.

18        Q.    When did you begin work at Cycle City?

19        A.    Beginning of last year.

20        Q.    Beginning of 2004?

21        A.    Yes.

22        Q.    Was there a period of time between Railco and

23   Cycle City where you were not employed?

24        A.    Yes.

25        Q.    How long?

1       A.   Several months.

2       Q.   Two months, three months, six months?

3       A.   Like three months.

4       Q.   What do you do at Cycle City?

5       A.   Drive.

6       Q.   Commercial driving, the same sort of thing?

7       A.   In some of the driving, yes.  There is parts of

8   the driving that need to be CDL, but there's parts that

9   don't.

10      Q.   What do you transport?

11      A.   Motorcycles, four-wheelers, snowmobiles.

12      Q.   Is that a full-time position?

13      A.   Yes, it is.

14      Q.   How many hours a week do you work?

15      A.   Approximately 60 to 70.

16      Q.   And how are you paid at Cycle City, sir?

17      A.   Hourly.

18      Q.   What is that hourly wage?

19      A.   8.25.

20      Q.   And you indicated to me that Walter has benefits

21  through your employment there?

22      A.   Yes.

23      Q.   I assume you do too?

24      A.   Yes.

25      Q.   Is that a local transporter; do you get

1    long-distance transport?

2        A.    I'm home every night, it's local.

3        Q.    You told me that you reside alone, except you

4    reside with your brother currently.  You see your children

5    on weekends; is that right?

6        A.    We have joint custody.  I see them whenever I want

7    to, and they are always with me on the weekends.

8        Q.    Are you paying child support?

9        A.    Yes.

10        Q.    And Walter Knight, is he residing with you part of

11    the time?

12        A.    No.

13        Q.    Are you paying child support with regard to

14    Walter?

15        A.    Yes.

16        Q.    Have you had any other employment since June of

17    2002 that we haven't discussed?

18        A.    No.

19        Q.    Any other work for compensation where you were

20    perhaps self-employed --

21        A.    No.

22        Q.    -- or odd jobs that we haven't discussed?

23        A.    No.

24        Q.    Is it your intent to remain at Cycle City, to

25    continue working there?

1      A.    I guess, yes.

2      Q.    You paused, are you thinking of moving elsewhere?

3      A.    You never know what happens so --

4      Q.    I understand that one of the allegations in the

5  lawsuit is that you are making less money currently now for

6  Cycle City then you were at the time that you were assigned

7  to the GAF MC Erie plant.  Have you sought other work for a

8  greater hourly wage?

9      A.    Yes.

10     Q.    Where have you looked?

11     A.    All over.

12     Q.    Where have you applied?

13     A.    All over.

14     Q.    Tell me where you have applied.

15     A.    Several trucking agencies around here.  The thing

16  about trucking around here is you have to go over the road

17  which just doesn't work with me and my family.

18     Q.    Where have you applied when you say several

19  trucking?

20     A.    Fed-X, UPS, can't think of the name of the

21  trucking company in North East, and that's about it in this

22  area for trucking.

23     Q.    Have you applied for jobs other than trucking?

24     A.    Yes.

25     Q.    What?

1        A.    I can't recall, but I have several places that I

2    put ap's in.

3        Q.    What kind of work?

4        A.    Machinist, laborer.

5        Q.    Are you able to identify for me any of those

6    places that you applied?

7        A.    I can't recall.

8        Q.    Now, you said that the problem with the other

9    trucking companies that you considered or applied with is

10   that you have to go over the road and that doesn't work with

11   your family.

12       A.    Yes.

13       Q.    Have you actually been offered a job by another

14   employer?

15       A.    Yes.

16       Q.    By whom?

17       A.    TLC, I forgot about that.

18       Q.    Is that a trucking company?

19       A.    Yes.

20       Q.    Where is TLC?

21       A.    It's Route 8 and 90.

22       Q.    When did TLC make you an offer of employment?

23       A.    Last fall.

24       Q.    What was the hourly wage there?

25       A.    It was mileage.

```
1        Q.   What would that have been?

2        A.   I think they said 30-something, 34, 30, 32.

3   Guaranteed home on the weekends.

4        Q.   Why did you decline that employment?

5        A.   My kids are at the age where I have to be home,

6   and gone all week just doesn't work.

7        Q.   So it wasn't sufficient for your personal reasons

8   to be home just on weekends?

9        A.   Yes.

10       Q.   You wanted to be home weekday evenings?

11       A.   Week evenings, whatever you want to call them, but

12  yes I wanted to be home.

13       Q.   Monday through Friday?

14       A.   Evenings, yes.

15       Q.   What are your hours now at Cycle City?

16       A.   They're actually 9:00 to 8:00 Monday and Thursday.

17       Q.   Monday through Thursday?

18       A.   Yes.  9:00 to 6:00 other than that, 9:00 to 3:00

19  Saturdy.

20       Q.   Off Sunday?

21       A.   Yes.

22       Q.   When you were assigned to GAF MC in Erie you, as I

23  understand it, you made both runs in town, shuttles in town,

24  as well as over the road transports; is that correct?

25       A.   What do you consider over the road?
```

1    Q.    Ohio, New York and Michigan.

2    A.    That's not really over the road because you're

3    home the same day, you are back before 4:00.

4    Q.    Let me go back then.  You did shuttle work in

5    town, correct?

6    A.    Yes.

7    Q.    And then you also did what I called over the road,

8    and you're not characterizing it as over the road, those

9    trips where you would go out of Erie County where did they

10    include?

11    A.    Michigan, Ohio, Canada sometimes, and New York

12    State.

13    Q.    Where in Michigan?

14    A.    Detroit mostly, in that area.

15    Q.    And how long would it take to drive from Erie to

16    Michigan, Detroit, Michigan?

17    A.    To get from here to Michigan is five hours.

18    Q.    So the driving part itself would be ten hours?

19    A.    Um-hmm.

20    Q.    Where in Ohio typically?

21    A.    Columbus, Cincinnati, it depends on where.

22    Q.    Could vary?

23    A.    Yes.

24    Q.    What was the farthest point in Ohio?

25    A.    Cincinnati.

```
 1      Q.    What does that drive take?

 2      A.    About six hours.

 3      Q.    One-way or round trip?

 4      A.    One-way.

 5      Q.    Where in Canada?

 6      A.    We only did it once, and it was in Ottawa.

 7      Q.    That wasn't a regular run?

 8      A.    No.

 9      Q.    And in New York State?

10      A.    Was a lot of Ripley, Buffalo, Syracuse.  And

11 Syracuse was about as far as we reached out on New York

12 State, that area.  That's about it, I went to New York City

13 twice.

14      Q.    What is the drive to Syracuse?

15      A.    Syracuse is about five hours.

16      Q.    One-way?

17      A.    Yes.

18      Q.    Your present source of income then is your

19 employment at Cycle City?

20      A.    Yes.

21      Q.    Do you have any other present source of income?

22      A.    No.

23      Q.    Are you currently on any medication?

24      A.    Nope.

25      Q.    During your employment and since the time that you
```

1    were assigned the work down in GAF Materials Corporation,

2    have you kept any diary or journal, personal log, anything

3    of that nature?

4        A.    For what?

5        Q.    Regarding -- again, a personal diary or log or

6    journal regarding employment or anything ongoing in your

7    life?

8        A.    You mean pertaining to GAF?

9        Q.    Well, I am asking you pertaining to anything right

10   now?

11       A.    Sure, I have diaries and journals pertaining to my

12   life, yeah.

13       Q.    Some people keep them and some don't.

14       A.    I don't know if I still have them.

15       Q.    Is that something that you have done consistently

16   or inconsistently throughout your life?

17       A.    I have written things down and thoughts down

18   before, yes.  It's not actually a journal but --

19       Q.    Do you know if you have kept those things?

20       A.    Don't know because of the move after I got

21   divorced and stuff like that, and then moving from one house

22   to another I don't know if they are still --

23       Q.    Intact?

24       A.    Yes.

25       Q.    Why did you move from Waterford to Erie?

1      A.    My roof fell in.

2      Q.    You elected to move and reside here rather than

3   repair your home in Waterford?

4      A.    Yes.

5      Q.    There was some reference in some of the documents,

6   Mr. Knight, to an allegation that as result of no longer

7   being assigned to GAF MC you lost a home or an opportunity

8   for a home?

9      A.    Yes.

10     Q.    Can you tell me about that, please.

11     A.    I was in the process of buying a house.

12     Q.    When was that?

13     A.    When I got fired from GAF.

14     Q.    Summer of 2002?

15     A.    Yes.  No -- well, yeah, I guess you can say

16  summer, beginning of summer, end of spring.

17     Q.    You last worked there late June of 2002, correct?

18     A.    Yes.

19     Q.    And where was this home?

20     A.    In Waterford.

21     Q.    Do you know the address?

22     A.    I can't recall right now.

23     Q.    Did you have a contract for purchase on the home?

24     A.    Yes.

25     Q.    Did you have a realtor?

1        A.    Yes.

2        Q.    Who was that person?

3        A.    Chapman.

4        Q.    That's a last name?

5        A.    Yes.

6        Q.    Male or female?

7        A.    Male -- female.

8        Q.    What happened that you were unable to purchase the

9    home?

10       A.    There was -- with losing my job I had this going

11   on and I lost a car too at the same time.  I just couldn't

12   come up with the money that I needed to complete the deal.

13       Q.    Tell me about the car.  Had you leased a car,

14   purchasing a car?

15       A.    I had bought it the day I got fired.

16       Q.    What is the day you got fired?

17       A.    26th of June.

18       Q.    What day of the week was that?

19       A.    Wednesday.

20       Q.    And you bought a car on Wednesday, June 26, 2002?

21       A.    25th, the night before.

22       Q.    Where was that?

23       A.    Where did I buy it?

24       Q.    Yes.

25       A.    Nissan of Erie.

1    Q.   What was it?

2    A.   Xterra.

3    Q.   What happened, you said you lost it?

4    A.   Yes.  I couldn't keep a car if I didn't have a

5 job, so they came and picked it up and closed the deal.

6    Q.   The car was repossessed?

7    A.   Not repossessed, they just picked it up.

8    Q.   Your brother, I think you told me his name is

9 Robert?

10    A.   Yes.

11    Q.   Does he work outside of the home?

12    A.   Yes.

13    Q.   What does he do?

14    A.   Electrician.

15    Q.   Is he employed somewhere or is he self-employed?

16    A.   He's a union worker, they are basically all laid

17 off during the winter.

18    Q.   He is not regularly with one employer?

19    A.   Not with the union, that's not how the union

20 works.

21    Q.   He is just placed?

22    A.   Yes.

23    Q.   Mr. Knight, you made reference earlier to leaving

24 or losing your position with the Erie County Prison or the

25 Albion State Prison as a result of criminal charges you were

```
 1   facing.  Do you have a criminal record?

 2        A.   Yes.

 3        Q.   What does that consist of?

 4        A.   Bad checks is what it consists of.

 5        Q.   And how many convictions does this involve?

 6        A.   I can't recall.

 7        Q.   Can you give me a ballpark one, two, five, six?

 8        A.   I would say nine.

 9        Q.   When was the first one?

10        A.   The first?

11        Q.   Conviction.

12        A.   They were altogether.

13        Q.   They were all at the same time?

14        A.   Yes.

15        Q.   When was that?

16        A.   '97, '96, I'm not sure.

17        Q.   '96 or '97, in that area?

18        A.   Yes.

19        Q.   Is that something to which you pleaded or was

20   there a trial?

21        A.   I pleaded.

22        Q.   Were you incarcerated?

23        A.   Yes.

24        Q.   For how long?

25        A.   Eighteen months.
```

1    Q.   Where?

2    A.   Erie County prison.

3    Q.   Any other criminal charges?

4    A.   November last year.

5    Q.   November 2004?

6    A.   No, 2003.

7    Q.   So a year-and-a-half ago?

8    A.   Yes.

9    Q.   What did that involve?

10   A.   Bad check.

11   Q.   Was there a plea?

12   A.   No, there was a trial.

13   Q.   What happened at the time of the trial?

14   A.   I was found guilty.

15   Q.   Were you incarcerated?

16   A.   Yes.

17   Q.   For how long?

18   A.   Actually work release in three months.

19   Q.   Work release for three months or three months

20   incarcerated?

21   A.   Three months, and then work release.

22   Q.   Were you represented by counsel in that matter?

23   A.   No.

24   Q.   Any other criminal charges?

25   A.   Not that I can recall.

1    Q.   Any protection from abuse orders?

2    A.   Yes.

3    Q.   When did those take place?

4    A.   '96 or '97.

5    Q.   That involved your ex-wife?

6    A.   Yes.

7    Q.   Any other criminal, civil matters?

8    A.   No.

9    Q.   Have you ever been a party in a lawsuit before?

10   A.   No.

11   Q.   Either as a plaintiff or defendant?

12   A.   Not that I know of.  I mean, my name might be on

13   something but not that I know of or can think of, no.

14   Q.   I understand that you did receive some

15   unemployment compensation benefits --

16        MR. McNAIR:  Objection, irrelevant.

17   Q.   -- after no longer being assigned at the GAF MC

18   facility in Erie; is that correct?

19   A.   Did I?  After I went to court, it wasn't because

20   they allowed me to have it.

21   Q.   So you received the unemployment compensation

22   benefits?

23   A.   After going to a referee hearing.

24   Q.   Mr. Knight, going back a minute, I failed to ask

25   you earlier when we were talking about different lawsuits, I

1    see from a civil docket search that there was a judgment

2    entered against you in 2004 for the amount $42,234.79.   Can

3    you tell me what that is about?   It is under the caption of

4    Erie County versus Dave Knight.

5         A.   I have no idea what that is.  I don't know.

6         Q.   Are you current with regard --

7         A.   Oh, okay, restitution from the --

8         Q.   Bad checks?

9         A.   Yes.

10        Q.   So that is with regard to the November 2003

11   charges that you told me about that there was trial or no?

12        A.   No.  That's in regard to the very original back in

13   '96 or '97, whatever it was.

14        Q.   Is there a restitution order in place with regard

15   to the November 2003 charges?

16        A.   No, it's paid.

17        Q.   I'm sorry?

18        A.   It was paid.

19        Q.   I also see with regard to a criminal docket search

20   a couple of occasions of tampering with public records.

21   What does that mean?

22        A.   What is it?

23        Q.   Yes.

24        A.   What the charge actually is?

25        Q.   Right.

1      A.    I bought a gun and I was under these charges and I

2   put no instead of yes, and that is what that is.

3      Q.    On the application to purchase the gun you

4   indicated that there had been no charges?

5      A.    I didn't think it was because I didn't think it

6   applied because there was no criminal charges.  I was just

7   being looked at for criminal charges, but they said since I

8   had already known about the charges that that was tampering

9   with public records.

10     Q.    Okay.  And then there's a forgery charge in 1997?

11     A.    Yes.

12     Q.    Is that related to the bad checks?

13     A.    Yes.

14     Q.    Theft by deception?

15     A.    That's all the bad checks, that's the charge I had

16  before the bad check is theft by deception.

17     Q.    Okay.  Receiving stolen property; do you recall

18  that in 1997?

19     A.    No.  That I don't know.

20          MR. McNAIR:  Are you saying there was a conviction

21          for that?  I don't think there was.

22          MS. BECK:  It doesn't indicate here, I would have

23          to go back and look.  There was a sentence so

24          there was either a plea or a conviction.

25          MR. McNAIR:  Sentence is a conviction.  There was

1          one sentencing of the '97 charges.  I don't recall

2          if the sentencing dates were the same.

3     Q.   Were there additional bad check charges in 2002?

4     A.   What do you mean?

5     Q.   I see that there are additional bad check charges

6  in 2002, and you had told me November of 2003.

7     A.   That's when it all came out, yeah.

8     Q.   That's the same charge?

9     A.   Yes.

10    Q.   Excuse me, November of 2003 is when the trial took

11 place?

12    A.   Yes.

13    Q.   Any other criminal charges?

14    A.   No.

15    Q.   Are you current with regard to child support

16 payments to your five children with Mary Knight?

17    A.   Yes.

18    Q.   Are you current with regard to Walter Knight?

19    A.   Yes.

20    Q.   Mr. Knight, you told me earlier that you were

21 working for Dunlap Trucking when you became interested in

22 being assigned to work at GAF MC.  How then did you change

23 employment?

24    A.   Put an application in at GAF.

25    Q.   Let's talk about that.  Did you know someone

1    there, were you recommended, was it suggested to you?

2        A.    I knew nobody there.  I just heard people talking

3    about it.

4        Q.    On your application it refers to someone named

5    Murphy?

6        A.    That is the one that was talking about it.

7        Q.    In your work for Dunlap Trucking were on-site at

8    GAF MC?

9        A.    For Dunlap, yes.

10       Q.    You had been to the facility before?

11       A.    Yes.

12       Q.    Bringing things in to GAF?

13       A.    Taking out.

14       Q.    And taking out?

15       A.    Yes, taking out mostly.

16       Q.    With whom did you speak about changing employment,

17   who from GAF MC, if anyone?

18       A.    Brian, I can't think of his last name.   Carlo

19   Melia,  Ben Clement.

20       Q.    Anyone else about working at or for GAF MC?

21       A.    The drivers, there was Larry and Dennis.

22       Q.    How did you apply for a position?

23       A.    I had to go up to the guard shack, and then I went

24   in to see Brian and he gave me an application and I applied

25   right through GAF.

1      Q.    Were you there in the course of employment for

2   Dunlap when this happened?

3      A.    What do you mean?

4      Q.    Did you go separately one day to GAF and ask about

5   this?

6      A.    Yes.

7      Q.    And you told me you asked at the guard shack, did

8   you go in then to see Brian?

9      A.    Yes.

10      Q.    Was anyone else present?

11      A.    Not that I recall.

12      Q.    And what conversation did you have with Brian at

13   that time?

14      A.    He gave me an application to fill out.

15      Q.    This is at the Erie facility down on Bayfront

16   Highway?

17      A.    Yes.

18      Q.    Did you fill it out right then and there or take

19   it?

20      A.    I can't recall if I did or not.

21      Q.    You can't remember if you sat down and completed

22   it there or took it with you?

23      A.    I am positive I took it with me and filled it out

24   at home.

25            (DEFENDANT'S EX. 1 - APPLICATION,

1          marked for identification.)

2      Q.   I will show you -- we can mark it as Exhibit 1

3  once I make some more copies.  Mr. McNair had it out in

4  front of you a short time ago, Mr. Knight.  It is a

5  four-page, double-check, four-page document entitled

6  driver's application for employment.  If you can take a

7  second and look at that for me.

8      A.   Um-hmm.

9      Q.   Is that the application that you are telling me

10  about?

11      A.   Yes.

12      Q.   And it is your testimony that Brian at GAF MC

13  provided it to you?

14      A.   Yes.

15      Q.   What was your understanding of for whom you were

16  or with whom you were applying for employment?

17      A.   GAF.

18      Q.   The company listed at the top of the application

19  is Transportation Unlimited, Inc., correct?

20      A.   Yes.

21      Q.   Can you tell me anything about the conversation

22  you had, if any, with Brian when you were telling me he

23  provided you an application?

24      A.   He asked me when I could be available.  I told him

25  I would be available as soon as he needed me, and that was

```
 1   the basic conversation.

 2       Q.   Anything else you recall about that conversation?

 3       A.   No.

 4       Q.   What happened next?

 5       A.   Um, we called Carlo Melia.  We talked to Carlo,

 6   and Carlo talked to Brian, talked it over, said I was hired

 7   and I went down and saw Clement.

 8       Q.   Same day, same time?

 9       A.   It was within a day or two.

10       Q.   When you say we called Carlo --

11       A.   We, I didn't mean we, Brian, whatever, called

12   Carlo.

13       Q.   Were you present?

14       A.   The one time, yes.

15       Q.   Well, you returned with your application; do you

16   recall doing that?

17       A.   Yes.

18       Q.   And with whom do you meet to speak?

19       A.   Brian.

20       Q.   With Brian.  Are you present at any time when he

21   makes a phone call?

22       A.   Yes.

23       Q.   Okay.  Is that that date?

24       A.   The date I returned this, yes.

25       Q.   You come back with your application, and I see
```

1    that it is dated and signed on the last page, correct?

2        A.    Yes, 3/10.

3        Q.    3/10, 2000, March 10, 2000?

4        A.    Yes.

5        Q.    That's your signature?

6        A.    Yes, it is.

7        Q.    So on or about that date you are telling me you

8    returned to GAF MC and gave this to Brian?

9        A.    Yes.

10       Q.    What was discussed during the phone conversation

11   that you were present for?

12       A.    If they were going to hire me or not.

13       Q.    So you're sitting in the room and Brian is talking

14   to Carlo about whether they were going to hire you?

15       A.    Yes.

16       Q.    Did you take part in the conversation?

17       A.    No.

18       Q.    Was it on speaker phone?

19       A.    No.

20       Q.    Did you speak with Carlo at that time?

21       A.    After he got done talking to Brian.

22       Q.    Did you have any discussions with Brian prior to

23   that phone call?

24       A.    Yes.

25       Q.    What were those conversations?

1      A.   Exactly when I would be available, and if I wanted

2  a job, and stuff like that.

3      Q.   Same kind of thing --

4      A.   Yes.

5      Q.   -- as when you picked up the application?

6      A.   Yes.

7      Q.   Do you know what the conversation was between

8  Brian and Carlo?

9      A.   I couldn't hear what Carlo was saying on the

10  phone.

11      Q.   Do you remember what Brian said?

12      A.   To the exact word?  He seems okay, and stuff like

13  that.

14      Q.   Anything else?

15      A.   (Witness moved head side to side.)

16      Q.   That's a no?

17      A.   No.

18      Q.   You're testifying that you then spoke with Carlo

19  yourself?

20      A.   Yes.

21      Q.   That was by telephone, the same meeting?

22      A.   Yes.

23      Q.   What was that conversation?

24      A.   He asked me basically what Brian and him were just

25  talking about, you know, what kind of person, if I was ready

```
 1    to take the job and stuff like that.

 2        Q.   Anything else you recall?

 3        A.   Not that I can recall.

 4        Q.   Discussion of hours, wages, vacation, discipline,

 5    the relationship with Transportation Unlimited --

 6        A.   No.

 7        Q.   -- did you discuss that with Brian?

 8        A.   Brian, basically when Brian said I would be

 9    working for GAF, that's exactly what Brian said.  He said

10    that he explained that Transportation Unlimited is actually

11    a trucking company that they are leased from and said I

12    would actually be working for GAF and Ben would be in charge

13    of me and tell me everything that was going on as far as

14    everything down at the shipping because Ben was in the seat

15    that Joe is in now.

16        Q.   So Brian did tell you about Transportation

17    Unlimited?

18        A.   He said -- yeah, as far as that's who they are

19    leased from.

20        Q.   That's who GAF leases from?

21        A.   That's who GAF is leased.

22        Q.   Your testimony is that Brian told you that you

23    would be employed by GAF?

24        A.   That I work for GAF, yes.

25        Q.   What discussion did you have about that, if any,
```

1    with Carlo?

2        A.    Carlo never said anything.

3        Q.    What happened after that?

4        A.    I went down and met Ben, and Ben wouldn't -- I

5    wanted to drive that day, but Ben said, no, because I didn't

6    have my physical.  I had to get my physical and my

7    urinalysis.  The urinalysis didn't come through until the

8    next day, and I started driving the next day after that.

9        Q.    Mr. Knight, I will show you also what is entitled

10   drug testing program and policy and condition of employment

11   with a Transportation Unlimited logo on the top.

12       A.    Um-hmm.

13       Q.    Were you provided that that same day or with the

14   application?

15       A.    I really can't recall.

16       Q.    Is that your signature --

17       A.    Yes.

18       Q.    -- and date on the bottom?

19       A.    Yes.

20       Q.    It is dated March 10, 2000?

21       A.    Yes.

22             (DEFENDANT'S EX. 2 - DRUG TESTING PROGRAM,

23              DEFENDANT'S EX. 3 - DRIVER'S RECEIPT,

24              marked for identification.)

25       Q.    That will be Exhibit 2.  Exhibit 3 I will provide

1    you with a piece of paper that's entitled driver's receipt.

2    It looks like a copy of something smaller than the whole

3    page.

4         A.    Um-hmm.

5         Q.    It acknowledges issue of a Federal Motor Carrier

6    Safety Regulation Pocketbook.

7         A.    Yes.

8         Q.    Is that something that you received that date?

9         A.    Yes.

10        Q.    And that's your signature and the date is March

11   10th of 2000?

12        A.    Yes.

13        Q.    And the company is identified as Transport

14   Unlimited, Inc.  Is that your handwriting?

15        A.    Yes.

16             (DEFENDANT'S EX. 4 - NOTICE TO DRIVERS,

17              marked for identification.)

18        Q.    Exhibit 4 is a Transportation Unlimited paper that

19   says notice to drivers under Roman Numeral I and Roman

20   Numeral II is certification by the driver.  It has filled

21   out driver's name, address, and that sort of thing.  Those

22   first three lines, is that your handwriting or no?

23        A.    Yes.

24        Q.    That is your handwriting.  And then that's your

25   signature under driver's signature?

```
 1        A.    Yes.  Wait a minute, this isn't my writing.

 2        Q.    I thought that looked different, the driver's

 3   license number?

 4        A.    This is not my writing in this.

 5        Q.    We need to identify when you say "this".  License,

 6   state, PA?

 7        A.    Yes.

 8        Q.    Type/class AM?

 9        A.    Um-hmm.

10        Q.    ID No. 19905208?

11        A.    That's not my writing.

12        Q.    But the first two lines is your writing?

13        A.    Yes.

14        Q.    And then your signature?

15        A.    Yes.

16        Q.    This is a document that will be our next Exhibit

17   5, and is entitled --

18             (DEFENDANT'S EX. 5 - REQUEST FOR INFORMATION,

19              marked for identification.)

20             MR. McNAIR:  None of these documents are contained

21             in his personnel file at Transportation Unlimited.

22             I would be very curious as to the source of these

23             documents.

24             MS. BECK:  That's where they came from, and both

25             the copy I obtained and the one that you provided
```

1              me.    They are in there.

2          Q.    Requests for information from previous employer.

3          A.    Um-hmm.

4          Q.    Again, is this your handwriting next to applicant

5     signature?

6          A.    Yes.

7          Q.    And the date of this is actually April 3, 2000,

8     correct?

9          A.    Yes.

10         Q.    And is this your handwriting where it says

11    Transportation Unlimited?

12         A.    Yes.

13         Q.    I hereby authorize you to release the following

14    information to Transportation Unlimited.

15         A.    Yes.  Wherever that's put, we were -- or I was

16    told to fill out whatever, Transportation Limited, whatever.

17    Whenever I was told in the paperwork, that's what they were

18    telling me to put in the different spots.

19         Q.    Who provided you with this paperwork?

20         A.    Brian.

21         Q.    And Brian told you to --

22         A.    Like when I asked the question, okay, what goes

23    here, Transportation Limited goes there.

24              (DEFENDANT'S EX. 6 - DOCUMENT,

25               marked for identification.)

1      Q.   So that would hold true for the next document, the

2   next Exhibit 6, it is in three sections.  Section one to be

3   completed by the prospective employee.  Section two is to be

4   completed by previous employer.  Section three to be

5   completed by prospective employer.  And this first

6   section --

7      A.   This is not my writing.

8      Q.   Hold on.  In this first section it identifies

9   previous employer as Dunlap Trucking, correct?

10     A.   Um-hmm.

11     Q.   Is that your handwriting?

12     A.   The prospective employer, no.

13     Q.   No, the previous employer Dunlap Trucking?

14     A.   No.

15     Q.   Prospective employer is Transportation Unlimited;

16   is that your handwriting?

17     A.   No.

18     Q.   Underneath it is -- is that your signature?

19     A.   Yes.

20     Q.   That's dated March 20, 2000?

21     A.   That's not -- the date there is not my writing.

22   This is my writing.

23     Q.   The Social Security number?

24     A.   Social Security number.

25     Q.   And your signature?

```
 1        A.    Yes.

 2              MR. McNAIR:  What is that, what exhibit is that?

 3              MS. BECK:  6.

 4        Q.    Mr. Knight, did you meet a gentleman named Sam

 5   Zarzour at some point?

 6        A.    Not that I recall.

 7        Q.    I will show you a document I do not have a title

 8   on.  In the middle it states authorization for release of

 9   police records, authorization for release of medical records

10   and ask you --label that the next exhibit -- and ask you,

11   your signature appears here it looks like four times?

12        A.    Um-hmm.

13              (DEFENDANT'S EX. 7 - AUTHORIZATION FOR RELEASE,

14               marked for identification.)

15        Q.    And that is dated March 10, March 10, and the last

16   one is actually -- oh, that's March 10 too, correct?

17        A.    Um-hmm.

18        Q.    Is that your dating?

19        A.    Um-hmm.  That's their dating over here, but that's

20   my dating over here.

21        Q.    Right.  And then the right side the witness

22   signature identified three places.  Best I can tell from the

23   various documents it says Sam Zarcor, Z-A-R-C-O-R, or

24   Zarzour, Z-A-R-Z-O-U-R.

25        A.    I don't recall that name.
```

1       Q.   In completing this documentation and getting the

2  test, which you already talked to me a little bit about, is

3  there anyone else with who you met or spoke?

4       A.   What, for employment?  Not that I can recall.

5       Q.   You told me about Brian, correct?

6       A.   (Witness moved head up and down.)

7       Q.   Yes?

8       A.   Yes.

9       Q.   You nodded your head.

10       A.   Sorry.

11       Q.   You spoke with, you told me, via the phone with

12  Carlo?

13       A.   Yes.

14       Q.   And you told me that you were taken down to be

15  introduced to Ben Clement, correct?

16       A.   Yes.

17       Q.   Anyone else from any organization with whom you

18  spoke or met?

19       A.   Not that I can recall.

20       Q.   Did you speak with anyone from Transportation

21  Unlimited?

22       A.   No.

23       Q.   Or anyone appearing on behalf of Transportation

24  Unlimited?

25       A.   No, no.