1    Q.   Did you meet with anyone?

2    A.   No.

3    Q.   Did you meet with this Sam Zarcor or Zarzour?

4    A.   I already said I don't recall him.

5         MR. McNAIR:  Is this number 7?

6         MS. BECK:  I think so.

7    Q.   Mr. Knight, you referenced a physical examination

8  that was required; is that right?

9    A.   Urinalysis.

10   Q.   That took place that day or the next day; is that

11 right?

12   A.   Um-hmm.

13        (DEFENDANT'S EX. 8 - MEDICAL REVIEW,

14         marked for identification.)

15   Q.   And included within the Transportation Unlimited

16 records is what I'll mark 8.  It's a medical review officer

17 report with what looks like results of a controlled

18 substance test.

19   A.   Um-hmm.

20   Q.   Date of collection being March 21 of 2000.

21   A.   That must be when I took the thing back, the

22 application back.

23   Q.   So there was a little period of time in between?

24   A.   I wasn't sure of the dates and the time period.

25   Q.   That's fine.  I am trying to recreate sometime

1    later, of course.  So the dates on the original

2    documentation including the witnessing shows March 10, and

3    then actually it looks like the urinalysis was March 21?

4        A.    I guess.  I know I took a urinalysis the first day

5    I drove or went down to drive.

6        Q.    It was the same date, you believe?

7        A.    Yes.  Because I couldn't drive without it.

8        Q.    This is directed to Transportation Unlimited?

9        A.    Yes.

10       Q.    I see that there was one additional test four

11   months or so later, it looks like on July 5th of 2001.

12           MS. BECK:  I will mark those --

13       A.    That's probably random.

14           MS. BECK:  8 and 9.

15           (DEFENDANT'S EX. 9 - MEDICAL REVIEW,

16            marked for identification.)

17       Q.    That's what I was going to ask you.  You were

18   subject to random testing?

19       A.    Yes, we were.

20       Q.    The date of collection on each of these is July 5,

21   2001, correct?

22       A.    That's what it says, yes.

23       Q.    And these are directed to Greg Meyers at

24   Transportation Unlimited, correct?

25       A.    Yes.  The one is, the other one isn't.

1      Q.    The other is just directed to Transportation

2    Unlimited and underneath it says contact Greg Meyers?

3      A.    Okay.

4            MR. McNAIR:  What numbers are those?

5            MS. BECK:  I believe 8 and 9.  We will mark the --

6            MR. McNAIR:  Alcohol test.

7            MS. BECK:  8.

8            MR. McNAIR:  Says test type R-A-N, and then the

9                  next one is a drug test, test type random, date of

10                 collection 7/5/01.

11     Q.    How was a random drug test to take place?  How did

12    it take place?

13     A.    You would walk in the office and they'd tell you

14    you have to take a drug test at the place up on Sass.

15     Q.    Do you --

16     A.    Occupational Health.

17     Q.    Do you know who directed the drug test, whether

18    that was someone at GAF MC or someone --

19     A.    I have no idea.

20     Q.    -- at Transportation Unlimited?

21     A.    I have no idea.

22     Q.    Mr. Knight, did you ever meet anyone that you

23    understood either to be from or representing Transportation

24    Unlimited?

25     A.    Carlo, he was there.  Carlo came down once or

1  twice while I was there.

2      Q.   Did you understand him to be from TU?

3      A.   I understood him to be some kind of liaison

4  between the two.  He made decisions.

5      Q.   Anyone else you understood to be from TU or

6  representing TU.

7      A.   I understand that he -- not saying that he was

8  representing TU, I was understanding he was the connection

9  between the two.

10     Q.   Okay.  Anyone else?

11     A.   Not that I recall.

12     Q.   Did you speak with, have you ever spoken with

13  anyone from Transportation Unlimited or that was

14  representing Transportation Unlimited?

15     A.   Well, I think his name was Greg, which is -- I

16  think that's his name.  I used to have to call him to get

17  our vacation pay.

18     Q.   There was a reference to a gentleman named Greg

19  Meyers on some of those documents; does that sound familiar?

20     A.   I believe.

21     Q.   You believe that was the same person?

22     A.   Yes.

23     Q.   When did you have to contact Greg Meyers?

24     A.   Just to get our vacation pay.

25     Q.   And you understood him to be from TU or with TU?

1    A.   Yes.

2    Q.   You say to get your vacation pay, what does that

3    mean?  To schedule your vacation or tell them you were

4    taking vacation?

5    A.   No.  GAF scheduled our vacations.  GAF did all our

6    scheduling.  Greg actually was like he would calculate how

7    many hours we had coming to us for a pay period so we could

8    actually take a payment of our vacation without taking a

9    vacation because there was almost no times where you could

10   have like a week or two off because of the way we worked

11   down there.  So Greg would just pay us our lump sum of

12   vacation pay, and then whenever you got the day off, you got

13   the day off.

14   Q.   So I understand what you are telling me, you would

15   contact Greg who would pay you for vacation that you didn't

16   take?

17   A.   No, that we -- we already earned the vacation.

18   Q.   Right.  It was owed to you, you didn't actually

19   take the day off?

20   A.   Yes.

21   Q.   You were paid for those days you didn't take off?

22   A.   Yes, yes.

23   Q.   Any other contact with Greg Meyers?

24   A.   Not that I can think of, no.

25   Q.   Why did you have to contact Greg Meyers for that?

1      A.    That's what we were told to do.

2      Q.    By whom?

3      A.    Actually Ben is the one that told us that that's

4   how you get your vacation pay.

5      Q.    Any other discussions at any time with anyone from

6   Transportation Unlimited or representing Transportation

7   Unlimited?

8      A.    Not that I can recall.

9      Q.    When your work at the GAF MC plant discontinued,

10  did you ever speak with anyone from TU, try to contact TU?

11     A.    What's that?

12     Q.    When your work down at the Erie facility

13  discontinued, did you speak with anyone from Transportation

14  Unlimited?

15     A.    I thought you meant as far as now, prior to

16  getting --

17     Q.    Okay.  Let me broaden it a little bit here.

18  During the scope, and I will chop it into two parts.  During

19  the scope of your employment and when you were assigned to

20  do the transportation work down at GAF MC, did you have

21  contact with anyone else from Transportation Unlimited?

22     A.    On the day I was fired --

23     Q.    Let me just say prior to that time.  Let's go up

24  to that point.

25     A.    That's the only contact I had, what I just said,

1   that I can recall but --

2       Q.   So now any other contacts with Transportation

3   Unlimited was from June 26, 2002 forward?

4       A.   Yes.  As far as I can recall.

5       Q.   We will return to that then.  You don't recall

6   being interviewed by anyone from TU?

7       A.   Interviewed, no.

8       Q.   In fact, you told me you don't recall speaking

9   with anyone from or representing to you at the time that you

10  applied for employment?

11      A.   No.

12      Q.   How were you paid when you were assigned to the

13  GAF MC plant?

14      A.   Weekly.

15      Q.   You received a paycheck from Transportation

16  Unlimited, correct?

17      A.   Yes.

18      Q.   You told me earlier that TU would pay you or

19  provide you with a vacation pay, but you scheduled vacation,

20  if any, with GAF MC?

21      A.   Yes.

22      Q.   With whom would you do that?

23      A.   They would have been Joe at the time of my

24  leaving.

25      Q.   Who prior?

1     A.   Ben Clement.

2     Q.   As I understand it during your assignment at GAF

3  MC you would have had two supervisors, initially Ben Clement

4  and then Joe Rinderle?

5     A.   Yes.

6     Q.   Any others that I have not identified?

7     A.   Not that I can recall.

8     Q.   And if you needed to take a day off or a couple

9  days of vacation, what did you do?

10    A.   You would have to either call in or tell Joe that

11  you needed these days off or whatever.

12    Q.   Did you contact anyone at TU?

13    A.   No, didn't have to.

14    Q.   What about the equipment you used, that was

15  provided by whom?

16    A.   I suppose it was GAF, it had GAF on the door.  I

17  don't know the ends of that part.

18    Q.   When you say the door, do you mean of the truck?

19    A.   Yes.

20    Q.   Did you have a CB radio?

21    A.   Yeah, that you put on your own.

22    Q.   That belonged to you?

23    A.   Yes.

24    Q.   Any other equipment that you would use in the

25  course of your work?

1    A.   Gloves boots, clothes.

2    Q.   Were those provided by yourself?

3    A.   Yes.

4    Q.   How about a cellular telephone?

5    A.   Cellular was provided by GAF.

6    Q.   Who gave that to you?

7    A.   Initially, I think Ben actually handed it to me.

8    Q.   Do you know who paid for the cellular charges?

9    A.   I have no idea.

10   Q.   Did you receive any handbook from TU, an employee

11   handbook?

12   A.   I can't recall to tell you the truth.

13   Q.   Did you receive an employee handbook from GAF MC?

14   A.   I can't recall.  I remember getting some kind of a

15   handbook, but I thought it was not an employee handbook.  I

16   thought was more of a driver's handbook.

17   Q.   We did see a receipt for a safety --

18   A.   Yeah, that's what I --

19        MR. McNAIR:  Federal Motor Carriers Safety

20        Regulations.

21   A.   Yes.

22        MR. McNAIR:  That's published by DOT.

23   Q.   Were you a subject to discipline at any time while

24   you were assigned to GAF MC?

25   A.   Was I -- what do you mean?  Did I get in trouble

1    at all?

2        Q.    Sure.

3        A.    Is that what you are trying to say?  No.  I got --

4    I don't even know what you would call it about the phone,

5    because I used too many minutes.

6        Q.    You're referring to the cell phone?

7        A.    Yes, the cell phone.  They said I used too many

8    minutes and if I continued to overuse the cell phone they

9    said that I would have to use a pay phone to call in from

10   now on, they were going to take the cell phone away.

11       Q.    Who is they?

12       A.    I imagine it would be Joe and Brian -- wouldn't

13   have been Brian then.  Ken Joint is the one that actually

14   talked to me.  He took Brian's place.

15       Q.    Okay.  Any other disciplinary measures?

16       A.    They made me pay for the bill that I over did,

17   whatever the overage charge.

18       Q.    Any meetings or discussions about attendance at

19   any time?

20       A.    Not that I can recall.

21       Q.    Any meetings or discussions about tardiness at any

22   time?

23       A.    Not that I can recall.

24       Q.    Were you subject to reassignment by TU to another

25   location?

1     A.    What do you mean?

2     Q.    Could TU have reassigned you to --

3     A.    Are they possible -- were they capable of

4  reassigning, is that what you are saying?

5     Q.    Yes.

6     A.    Yes.

7     Q.    When you assigned to GAF MC, there were other

8  leased drivers there from TU I understand; is that right?

9     A.    Yes.

10    Q.    Who would those persons be?

11    A.    Dennis and Murphy.

12    Q.    Do you know Dennis' last name?

13    A.    No.

14    Q.    Larry Murphy?

15    A.    Yes.

16    Q.    Were there any additional drivers?

17    A.    No.

18    Q.    Was there a gentlemen named Leonard VanCise?

19    A.    He came in after me.

20    Q.    He did not work at any time before your employment

21  ended with TU?

22    A.    He came in after I was hired.  He worked with me

23  but he came in after I was hired.

24    Q.    Let me rephrase my question.  At any time when you

25  were assigned to GAF MC --

1    A.    The whole time, yes, there was Leonard VanCise.

2    Q.    Any other drivers?

3    A.    No.

4    Q.    All four -- were all four of you leased from

5    Transportation Unlimited?

6    A.    Yes.

7    Q.    Did you complete any paperwork in the course of

8    your work assignment at GAF MC?

9    A.    I don't understand.

10    Q.    Did you ever have to submit any paperwork to,

11    let's say, Transportation Unlimited with regard to hours or

12    vacation or pay?

13    A.    Not that I can recall.  I mean, we had a GAF punch

14    card that was a little thing they slid through a computer,

15    and that's what our time was.

16    Q.    Did you have to punch in when you arrived each

17    day?

18    A.    Yes.

19    Q.    And that was located where?

20    A.    In the lunchroom.

21    Q.    At the GAF MC facility?

22    A.    Yes.

23    Q.    And --

24    A.    There were several spots you could do it, but

25    that's where you normally did it at.

1          Q.    Tell me how that worked, a card that you would

2     slide in?

3          A.    Magnetic end on it and you slide it in and it

4     would show you punched in, it had a number on it.

5          Q.    Your driver number?

6          A.    Employee number, GAF employee number.

7          Q.    How do you know it was a GAF employee number?

8          A.    It says GAF on it, I believe.

9          Q.    On?

10         A.    The card.  It was issued by GAF, the secretary.

11         Q.    I was just about to ask you who provided that to

12    you.  Do you know who that was?

13         A.    I can't think of her name.

14         Q.    Was that at the Erie facility?

15         A.    Yes.

16         Q.    And then would you use the same card when you left

17    for the day?

18         A.    Yes.

19         Q.    Did you complete weekly driver's records?

20         A.    Yes, we had logs.

21         Q.    Tell me about completing the logs.

22         A.    It's a regular driver's log and turn your log

23    into -- there is a little desk next to Greg Guarino and

24    that's where we put our logs at.

25         Q.    Okay.  Greg Guarino was located where?

1    A.    Inside the office where Joe is.

2    Q.    This is at, again, GAF MC Erie plant?

3    A.    Yes, yes.

4    Q.    And you would record in the log each day?

5    A.    Driver's log you have to drive -- you have to

6    record what you drove or did not drive.  It's a seven-day

7    log, twenty-four/seven log.

8    Q.    You were responsible for completing that log?

9    A.    Yes.

10    Q.    Did you do that?

11    A.    Yes.

12    Q.    Did you do that accurately to the best of your

13    knowledge and ability?

14    A.    Yes.

15    Q.    Were you involved in any accidents?

16    A.    Yes.

17    Q.    Tell me about those, please.

18    A.    I had one in New York State.  And I had one in

19    Cleveland.

20        (DEFENDANT'S EX. 10 - 8/23/00 LETTER,

21         marked for identification.)

22    Q.    I have a copy of a what we will mark as Exhibit

23    10.  Take a second to look at it, Mr. Knight, I think it is

24    a letter directed to you from Sam Zarzour of Transportation

25    Unlimited.  Do you recall receiving this?

1    A.    I never actually saw this but -- let me rephrase

2    that.  I never saw that while I was employed at GAF.

3    Q.    What this refers to is an August 8, 2000 accident,

4    right?

5    A.    What's that?

6    Q.    An August 8, 2000 accident.

7    A.    That's what it says, yes.

8    Q.    Was that the Cleveland or New York accident?

9    A.    New York.

10    Q.    What happened, if anything, as a result of that

11    accident in August of 2000?

12    A.    I was fined.

13    Q.    Fined by?

14    A.    New York State.

15    Q.    Were you provided any discipline by Transportation

16    Unlimited?

17    A.    No.

18    Q.    Any discipline by GAF MC?

19    A.    No.

20    Q.    Your testimony is that you did not receive this

21    letter from Mr. Zarzour?

22    A.    I don't -- no, I didn't.

23    Q.    Was this your correct address at the time?

24    A.    Yes.

25    Q.    In Waterford, Pennsylvania?

1      A.    Yes.

2      Q.    And the letter is dated August 23, 2000?

3      A.    Yes.

4      Q.    You did not receive this letter?

5      A.    No.

6      Q.    Were you ever advised by TU that the accident had

7    been charged to you as the responsible party?

8      A.    No.

9      Q.    No discussion with anyone from TU about this

10   accident?

11     A.    No.

12     Q.    How about the Ohio accident?

13     A.    The Ohio accident had a lot of discussions

14   about -- there was quite a few people involved in that.

15     Q.    I'll back up and wrap this one up.  Any discussion

16   with anyone from GAF MC about the New York accident?

17     A.    Yes.  I talked to Ben about it.

18     Q.    What was that discussion?

19     A.    Just he asked me what happened and I told him

20   about the two ladies, and I was emptying.  They were -- I

21   didn't realize they were looking for a street.  When they

22   saw the street they needed, I slammed on the brakes and I

23   couldn't stop as fast as they could and I rear-ended them.

24   That was about the extent of the whole --

25     Q.    What happened in the Ohio accident?

1      A.   I was rear-ended.

2      Q.   When did that take place?

3      A.   When?  I am not sure of the date, I think it was

4 2001, end of 2001.

5      Q.   I have a date of December 2, 2001; does that sound

6 right?

7      A.   That doesn't sound right because it was actually

8 warm out when it happened.  December 2 doesn't sound right.

9      Q.   Didn't you just tell me it was the end of 2001?

10     A.   Yeah, but I mean like September, October.  I don't

11 think it was quite cold in December.  It might have been, I

12 don't know.

13     Q.   What happened at the time of the accident?

14     A.   Pardon?

15     Q.   What happened at the time of the accident?

16     A.   I was coming out of ABC in, I don't know, it might

17 not have been ABC.  I was coming across the road from

18 delivering to a customer, and I was going to stage into a

19 parking lot across the street.  A guy was at the red light

20 and he took off from the red light and ran into the back

21 corner of my trailer.  It was 40 feet of skid marks behind

22 him, behind my trailer.

23     Q.   Did you have any discussions with anyone from TU

24 or anyone representing TU regarding that accident?

25     A.   I don't recall his name, though.  Yeah, I did.

1     Q.   Would it have been Sam Zarzour?

2     A.   I don't think so.  I am almost thinking it was

3  Pauley (phonetic) or something like that was the last name.

4     Q.   Glenn Pauley?

5     A.   Maybe.

6     Q.   What was that discussion?

7     A.   He asked me what happened.  I told him what

8  happened and we went to court.  And there was an attorney

9  waiting up there, but he wanted a bunch of money from me,

10  not from the company.  He said he was sent by the company as

11  a favor.  And then once I got up to Ohio, Lenny was a

12  witness, Leonard VanCise was a witness 'cuz he was sitting

13  there when it happened.  And once I got up to Ohio they kept

14  postponing us.  They postponed the thing like four or five

15  times.  So I'd have to go back the next month, the next

16  month and the next month.  Finally the judge said I was

17  found guilty of marked lanes.

18     Q.   Okay.  So you're telling me there was some kind of

19  scheduled hearing that kept getting postponed?

20     A.   Yes.

21     Q.   Did the hearing ultimately take place?

22     A.   Yes.

23     Q.   Where was this in Ohio?

24     A.   I can't think of the little -- it's up by the

25  airport off of 271.  I can't think of the name of the place.

1      Q.   Mr. VanCise was a witness at the hearing?

2      A.   Yes.

3      Q.   This was with regard to a moving violation that

4   you were being cited with?

5      A.   It was an accident, yes.

6      Q.   And was it a district justice that found you --

7      A.   Yes.

8      Q.   -- guilty of that charge?

9      A.   Yes.

10     Q.   What were your discussions with Glenn Pauley or

11   the gentleman you remember as Glenn from TU?

12     A.   Just he was telling me about the attorney, and

13   that's basically -- his big concern was about an attorney.

14     Q.   I didn't understand your testimony in that regard.

15   Was Glenn telling you there would be an attorney there to

16   represent you at this hearing or was he telling you to get

17   an attorney; what was the attorney discussion?

18     A.   Glenn was saying that he wasn't going to pay or

19   that he would provide an attorney but it wasn't going to be

20   from his cost.  And then Carlo said that he would provide an

21   attorney, but neither of them provided an attorney.  It was

22   all at my cost if I wanted an attorney.

23     Q.   I see, okay.  Glenn -- do I understand your

24   testimony, and if I am misstating it tell me so, that Glenn

25   told you that TU was not going to pay for an attorney to

1    represent you at this hearing?

2        A.   Right.

3        Q.   And then do I understand that you're saying Carlo

4    said that --

5        A.   He would, but it never happened.

6        Q.   But did not?

7        A.   Yes.

8        Q.   Did you have counsel at the hearing?

9        A.   Not really.  It cost me -- I got up there and the

10   guy said he would cover it.  He said he could take care of

11   it because of the situation and he had the pictures and

12   everything else.  I ended up paying 250 bucks and he showed

13   up twice and then I didn't have him after that.

14       Q.   Okay.

15       A.   That was somebody that was sent by, I don't know

16   exactly, it was either GAF or Transportation Unlimited sent

17   them over.

18       Q.   You paid out-of-pocket for this gentleman to

19   appear twice?

20       A.   Yes, I did.

21       Q.   Were these at the hearing that got rescheduled?

22       A.   Yes.

23       Q.   Okay.  Any other discussions with Glenn of TU

24   regarding that accident or --

25       A.   Not that I can recall, no.

1          MR. McNAIR:  Object to the form of the question

2          identifying Mr. Pauley as an employee of

3          Transportation Unlimited.

4     Q.   I asked you when we first started discussing this

5   accident, Mr. Knight, whether you spoke with someone from or

6   representing TU about this accident and you said you had and

7   his name was Glenn.

8          MR. McNAIR:  He represents, but he doesn't work

9          for Transported Unlimited.

10    Q.   Your understanding --

11         MR. McNAIR:  As long as we're clear on that.

12    Q.   It's your understanding that he either represented

13  TU or was employed by TU, this Glenn person?

14    A.   I just understood that he was the upper echelon

15  and that he was involved in some kind of contact between GAF

16  and Transportation Unlimited.

17    Q.   Who did you have discussions with from GAF MC

18  about the accident, if anyone?

19    A.   That would be Joe.  I talked to Joe about it.  I

20  talked to Kenny Joint about it.  Lenny, of course, he was

21  standing there and he saw what happened.

22    Q.   Were you subject to any discipline by GAF MC as a

23  result of the accident?

24    A.   No.

25    Q.   Were you subject to any discipline by

1    Transportation Unlimited as a result of the accident?

2         A.    No.

3               MS. BECK:  I'd like to take a short break.

4               (Brief recess.)

5         Q.    Mr. Knight, we are back on the record now after

6    that short break.  I have been asking you about different

7    questions with regard to Transportation Unlimited and GAF

8    Materials Corporation.  In initiating this lawsuit against

9    GAF MC and Joe Rinderle you initially filed a Complaint, an

10   Amended Complaint that appears to be in your own

11   handwriting; is that correct?

12        A.    Yes.

13        Q.    And as I understand it that was before you

14   retained counsel, Mr. McNair, correct?

15        A.    Yes.

16        Q.    I will show you a copy of the Amended Complaint,

17   and ask again to confirm is this your handwriting?

18        A.    Yes.

19        Q.    And on the second page I have a portion

20   highlighted that states, the plaintiff was an employee of

21   Transportation Unlimited of Cleveland, Inc.  The plaintiff

22   was assigned to work at GAF Corp. of Erie as a CDL licensed

23   driver.  Did I read that correctly?

24        A.    Yes.

25        Q.    Is that your handwriting?

1      A.   Yes.

2      Q.   Mr. Knight, when you were assigned to GAF MC and

3  began transporting GAF materials, it was sometime in March

4  of 2000; does that sound right?

5      A.   Yes.

6      Q.   And I'm correct that when you -- at that time you

7  were one of three leased drivers and then an additional was

8  added at some point?

9      A.   Yes.

10      Q.   At that time it would have been yourself, you

11  identified Larry and Dennis, correct?

12      A.   Yeah.

13      Q.   And they were leased drivers from Transportation

14  Unlimited?

15      A.   Yes.

16      Q.   And who was your supervisor at that time?

17      A.   Initially?

18      Q.   Yes.

19      A.   Ben Clement.

20      Q.   And do you know who Mr. Clement's employer was?

21      A.   GAF.

22      Q.   What sort of supervision, if any, did he provide?

23      A.   He told me where I had to go, when I had to get it

24  there, what I was taking, what truck I was driving, the time

25  to be at work, time to leave, time to take lunch, told me

1  everything.

2      Q.  Do I understand correctly that GAF MC employees

3  would load the trucks typically or were you also involved in

4  loading the trucks?

5      A.  Strapping them down.

6      Q.  So let's break it down into parts for me, the lay

7  person.  Actually putting product on the truck, were you

8  involved in that?

9      A.  Depends if it was something we can pick up and

10  throw on top of some pallets, yeah.  There was different

11  parts that we were actually involved in loading, yes.

12  Samples.

13      Q.  Did you do any fork-lift operation?

14      A.  No.

15      Q.  You were involved, you made reference to strapping

16  parts down.

17      A.  Yes.

18      Q.  You would do that?

19      A.  Tarping and strapping.

20      Q.  Tarping and strapping, okay.  Mr. Clement worked

21  in that position until, it's my understanding, approximately

22  September of 2001; does that sound right to you?

23      A.  I'm not sure of the date, I really am not.

24      Q.  Did Mr. Rinderle -- when Mr. Clement was no longer

25  in that supervisor position, was it Mr. Rinderle that took

1    that job?

2        A.    Yes.

3        Q.    Those are the only two supervisors you had?

4        A.    Well, leadman.

5        Q.    Leadman, that was the title?

6        A.    Yes.  On weekends leadman would be in charge.

7        Q.    Okay.  That was someone other than Mr. Clement or

8    Mr. Rinderle?

9        A.    Yes.

10       Q.    Between the time you were initially assigned to

11   GAF MC and the time that Mr. Rinderle began as the

12   supervisor of the shipping department, did you have any

13   problems with any of the other employees or any of the other

14   leased drivers?

15           MR. McNAIR:  Object to the question as unduly

16           vague and incapable of answering.

17       A.    I'm not sure what you are asking.

18       Q.    Did you have, for example, any of the sorts of

19   incidents that you are claiming in this lawsuit?  Is there

20   any sort of racial harassment or hostile work environment

21   during that period of time?

22           MR. McNAIR:  Is the question was he subjected to

23           racial discrimination prior to Mr. Rinderle

24           becoming a supervisor?

25       Q.    Here's my question.  From the time that you began

1   assignment at GAF MC until the time that Mr. Rinderle became

2   the supervisor of the shipping department -- you understand

3   the window I'm talking about --

4       A.   Yes.

5       Q.   -- the window of time?  Were you subjected to any

6   racial harassment during that period of time related to your

7   work there?

8       A.   I can't give you a date time period-wise, you know

9   what I'm saying, in the window or not.  So I really can't

10  answer your question correctly because I don't want to say

11  that Ben was there when Joe wasn't, Joe was there when -- a

12  period of time.  I am not positive if it is just -- things

13  could have been said that I'm not positive if it was at the

14  end of Ben and the beginning of Joe or not.

15      Q.   Okay.  Did you raise any sort of complaint with

16  anyone at Transportation Unlimited or GAF MC about racial

17  harassment while Ben was your supervisor?

18      A.   Not that I can recall at this time.

19      Q.   Did you file any sort of charge of discrimination

20  with EEOC or PHOC while Ben was your supervisor?

21      A.   No.

22      Q.   You are unable, if I understand your testimony

23  correctly, you are unable to identify for me any events or

24  incidents of racial discrimination or harassment while Ben

25  Clement was your supervisor?

1          MR. McNAIR:  Object to that, that mischaracterizes

2          his prior testimony.

3      Q.   Are you able to identify any for me while Ben

4    Clement was your supervisor?

5      A.   I'm not -- no, I can't.  I just can't place Ben at

6    the seat of an incident happening, so at this time I can't.

7          MR. McNAIR:  Are you asking him to admit that no

8          incidents of racial harassment occurred while Ben

9          Clement was his supervisor?

10          MS. BECK:  I have asked him if he is able to

11          identify any, that's the testimony he provided.

12          MR. McNAIR:  Well, I think that this is a little

13          confused here because I think that you're asking

14          one thing, and I'm sure he does not understand the

15          question.

16          MS. BECK:  Well, I've asked him three times now.

17          MR. McNAIR:  I objected to the question three

18          times, and I am objecting to it again.

19          MS. BECK:  That's fine.  His testimony is on the

20          record, Tim.  We can move on or continue to beat

21          it up.

22      Q.   Mr. Knight, did Ben Clement ever subject you to

23    racial harassment or discrimination?

24      A.   No, never.

25      Q.   When was the first incident that you have alleged

1    there was a racially hostile work environment present, when

2    was the first event or incident you can identify for me?

3              MR. McNAIR:  Are you asking what it was or are you

4              asking for a date?

5              MS. BECK:  Tim, I am asking him what it was, and

6              then I am going to ask when it was.

7        A.    When we started doing a lot of lot work and Larry

8    Murphy referred to it as nigger work.

9        Q.    I'm sorry, you said a lot of lot work?

10       A.    Yes.

11       Q.    What is lot work?

12       A.    Running shingles from GAF here to the sand docks

13   or up to Raspberry or over to Lord's or wherever the lot

14   work, it was actually city work.

15       Q.    Were these also called shuttles?

16       A.    Shuttles.

17       Q.    So they're within Erie County?

18       A.    Yes.

19       Q.    And your testimony was that it was another of the

20   leased drivers, Larry Murphy?

21       A.    Yes.

22       Q.    Who described this work as nigger work; is that

23   correct?

24       A.    Yes.

25       Q.    To whom did he say this?

1    A.    The guys loading them.

2    Q.    Who were these people?

3    A.    One was John Whip.

4    Q.    And you said loading, are these GAF MC employees

5    loading the shingles?

6    A.    Yes.  I believe the other one was, I'm not

7    positive, I'm sure Charley Potter was the other one.

8    Q.    John Whip for sure and possibly Charley Potter?

9    A.    Yeah, because -- yeah.

10    Q.    Anyone else to whom Mr. Murphy said this?

11    A.    Not that I can recall.

12    Q.    Was he doing the shuttle or were you doing the

13    shuttle, whose truck was being loaded?

14    A.    That's why he said it, because he had to do the

15    shuttle.  I'd been doing it all the time.  And he had to do

16    it.  He came off the road and had to do it, and that's why

17    he said it.

18    Q.    Did he also say it to you or did you overhear

19    this?

20    A.    I was -- it was not directly to me but, yeah, I

21    was told that he said it.

22    Q.    Did you hear him say it?

23    A.    No.

24    Q.    Who told you Mr. Murphy said it?

25    A.    Whip.

1      Q.    John Whip?

2      A.    Yes.  And then he admitted to it.

3            MR. McNAIR:  Who admitted it?

4            THE WITNESS:  Murphy admitted to saying it.

5      Q.    Mr. Whip told you that Mr. Murphy had said this?

6      A.    Yes.

7      Q.    Was that that same day?

8      A.    Yes.

9      Q.    And then what happened after that, did you speak

10  with Mr. Murphy about it?

11     A.    No, I didn't.

12     Q.    How do you know Mr. Murphy admitted it?

13     A.    You mean did I speak after he admitted it?  No, I

14  didn't say a word to him.

15     Q.    Let me back up.  Mr. Whip told you that Mr. Murphy

16  said this, correct?

17     A.    Right.  We were in the lunchroom and Whip brought

18  it up and Murphy admitted, that's as far as I went with

19  Murphy.

20     Q.    Who was present in the lunchroom?

21     A.    Just about everybody, I would say like Roger

22  Ellis, Bob Stempka, Charley Potter.  One guy is dead now,

23  and another guy is out of town.

24     Q.    Is this the same day?

25     A.    Yes.

1    Q.    Tell me the specifics that you recall of this

2    conversation in the lunchroom.

3    A.    The specifics was that Whip asked Murphy if he

4    said that and -- no, actually I think Charley asked Murphy

5    if he said it and Whip said, yeah, it looks like you're

6    starting to get a little brown around the hands.  And Murphy

7    goes, yeah, I don't like doing that work anyway.  So his

8    specifics was --

9    Q.    Did you hear Mr. Murphy say this?

10   A.    Yes.

11   Q.    And you heard this conversation?

12   A.    Yes.

13   Q.    Were you seated at the same table?

14   A.    I was in the same room.

15   Q.    How big is this room?

16   A.    Maybe about the same size of this, maybe a little

17   longer because there's a bathroom on the end of it.

18   Q.    How far away were you from them?

19   A.    I was right there.

20   Q.    How far away from these individuals in terms of

21   feet?

22   A.    Close as me and you probably, five, four feet.

23   Q.    Okay.  Did you have any discussion with Mr. Murphy

24   about this?

25   A.    No.

1     Q.   Did you lodge any complaint with transportation

2  Unlimited?

3     A.   No.

4     Q.   Did you lodge any complaint with GAF MC?

5     A.   No.

6     Q.   Did you file any charge or complaint with the PHOC

7  or the EEOC?

8     A.   No.

9     Q.   Did you tell Mr. Clement?

10    A.   Yes.

11    Q.   Did you tell Mr. Rinderle?

12    A.   I don't remember telling Joe.

13    Q.   Who was your supervisor at the time?

14    A.   I believe it was Joe.  I think that was the

15  initial part where Ben and Joe were changing over and they

16  both were kind of back there.  That's why I was unsure,

17  that's why I said at the beginning that I was unsure if Ben

18  was still there when one of the racial things happened

19  because Ben was there, but I think Joe had already taken the

20  seat but he wasn't -- there was like a training session and

21  that's when that happened.

22    Q.   So if Mr. Rinderle, Joe Rinderle, if I represent

23  to you that he took over as supervisor in September of 2001,

24  you are telling me there was overlap where Joe and Ben were

25  still both on the scene?

1    A.    Yes.

2    Q.    Is that when this would have taken place?

3    A.    In that area.

4    Q.    We are talking about the fall of 2001?

5    A.    (Witness moved head up and down.)

6    Q.    Is that correct?

7    A.    Yes.

8    Q.    You told Ben Clement this?

9    A.    Yes.

10    Q.    When did you speak with Ben?

11    A.    That same day probably.

12    Q.    What did Ben say or do?

13    A.    He just -- I just told him how I felt about it,

14    and Ben just said, don't let him get to you, don't do

15    nothing stupid.

16    Q.    Did he do or say anything else to your knowledge?

17    A.    Not that I can remember at this time.

18    Q.    Did this happen on one occasion or more than one

19    occasion, Mr. Murphy's comment?

20    A.    Let's just say it escalated from there.  I mean,

21    there were comments made constantly after he said it.

22    Q.    By whom?

23    A.    Lot of people.  I mean --

24    Q.    Let's go back.  After Larry Murphy makes this

25    initial comment, what is the next thing that happens?

1      A.    I mean, there was comments made because of the

2   fact he said that.   Then --

3      Q.    Comments that you heard?

4      A.    Yeah.

5      Q.    Who made them?

6      A.    Whip was one of them, actually Whip was main one

7   and --

8      Q.    What comment or comments did he make that you

9   heard?

10     A.    They would ask Larry if his hands were getting

11  darker because he had to work in the yard.

12     Q.    You heard John Whip say this?

13     A.    Yes.

14     Q.    On how many occasion?

15     A.    Couple.

16     Q.    Was this directed to you or something you

17  overheard?

18     A.    Something I overheard.

19     Q.    Did you lodge any complaint with Joe Rinderle?

20     A.    No.

21     Q.    Did you lodge a complaint with Ben Clement?

22     A.    No.

23     Q.    Did you lodge a complaint with the EEOC or PHOC?

24     A.    No, I didn't.

25     Q.    And you overheard Mr. Whip make this statement to

1    Mr. Murphy on a couple of occasions?

2        A.    Yes.

3        Q.    What else did you hear, what other comments?

4        A.    Regarding?

5        Q.    You said to me that it escalated from there, what

6    was the next event or incident?

7        A.    Just regarding that or anything?

8        Q.    Well, do you know when you heard Mr. Whip make

9    these comments?

10       A.    I couldn't give you a date.

11       Q.    Who was your supervisor at the time?

12       A.    Joe was the supervisor but Ben may have been

13   there.

14       Q.    When you say Ben might have been there, you are

15   talking about that transition period?

16       A.    Yes.

17       Q.    Did you ever hear John Whip make any other racial

18   comments, what you would characterize as racial comments?

19       A.    He used to call downtown browntown.

20       Q.    John Whip?

21       A.    Um-hmm.

22       Q.    How many occasions?

23       A.    That was kind of a common saying for him.

24       Q.    So, again, how many times did you hear John Whip

25   say this?

1    A.    Several.

2    Q.    Did you make any complaints about this to anyone?

3    A.    No.

4    Q.    Any other comments that you heard or overheard by

5    Mr. Whip?

6    A.    No.

7    Q.    I should have asked you that initially about

8    Mr. Murphy, you told me about the initial comment, any other

9    racial comments?

10    A.    Not that I can recall at this time.

11    Q.    Any other racial comments by any other person?

12    A.    I was sitting in Joe's desk and he referred to me

13    as little black Joe.

14    Q.    You're pointing at Joe Rinderle?

15    A.    Yes.

16    Q.    When was this?

17    A.    Sometime after that event took place.

18    Q.    Was Joe Rinderle your supervisor at the time?

19    A.    Yes, he was.

20    Q.    Was Ben Clement still in the transition position?

21    A.    No, no.  Joe was the complete supervisor.  Ben

22    might have been over at the Lord's parking lot.

23    Q.    Okay.  So tell me about this incident, what

24    happened?

25    A.    I was sitting there doing my paperwork, actually

1    filling out my log, and Joe walked in.  And I believe Tim

2    Maisner and Greg Guarino were there.  And Joe made the

3    comment, hey, look little black Joe, because I was sitting

4    at his desk.

5         Q.   Was there any further discussion?

6         A.   No.

7         Q.   Did you respond?

8         A.   Nope.

9         Q.   Did you leave the office?

10        A.   Yes.

11        Q.   Did you lodge a complaint with anyone at

12   Transportation Unlimited?

13        A.   No.

14        Q.   Anyone at GAF MC?

15        A.   No.

16        Q.   At the EEOC or the PHOC?

17        A.   No.

18        Q.   There was no further discussion after this

19   comment?

20        A.   Nope.

21        Q.   Tim Maisner and Greg Guarino --

22        A.   Guarino.

23        Q.   -- were present?

24        A.   Yes.

25        Q.   Do you recall when this took place, Mr. Knight?

1       A.   What do you mean?  It was after Larry's incident,

2   and it was some time after that is all I can tell you.

3       Q.   Did Joe Rinderle, per your testimony, say this

4   once or more than once?

5       A.   I recall twice, but I can't recall any other than

6   that.

7       Q.   Tell me about the second incident.

8       A.   About the same, about the same as the first.

9       Q.   How far a part in time?

10      A.   Maybe a month maybe.

11      Q.   What happened at that time?

12      A.   Same thing.

13      Q.   Tell me.

14      A.   Exact same thing, I was sitting at his desk and

15  was referred to as little black Joe.

16      Q.   By who?

17      A.   Joe Rinderle.

18      Q.   Who else was present?

19      A.   That time I don't think Greg was there.  I think

20  Tim was just there.  And Mike -- I can't think of Mike's

21  last name.  He did the paperwork, I think he was there but

22  he didn't say two words to anybody.  He was kind of a quiet

23  guy.

24      Q.   Did you respond the second time?

25      A.   No.

1      Q.   Was there any conversation?

2      A.   No.

3      Q.   Was there any conversation by anyone in the room?

4      A.   Not that I can recall.

5      Q.   Had you completed your log?

6      A.   No, I got up and left.

7      Q.   Did you come back and complete your --

8      A.   I completed it in the lunchroom.

9      Q.   Any other racial comments at any time?

10     A.   Tim would refer to black guys as chods (phonetic).

11   He said it was Polish for black.

12     Q.   Let me go back to finish my question and then I

13   will follow up.  Any other racial comments or what you

14   characterize as racial comments at any time by Joe Rinderle?

15     A.   Not that I can recall.  Oh, yeah, sometimes he

16   would talk to me like he was from the street.  Like he would

17   down talk me, like what's up bro, what's going on, that kind

18   of thing.

19     Q.   Okay.  So are you telling me it was the manner of

20   speech not slurs or comments?

21     A.   No, it was the manner.

22     Q.   Mr. Knight, I am not sure I asked you, you

23   testified that there was a second incident where you were

24   seated in Joe Rinderle's chair and he referred to you as

25   little black Joe.  Did you make any complaints to anyone

1   about that?

2       A.   No.

3       Q.   This testimony about the street talking, the

4   manner in which Joe Rinderle sometimes spoke to you, did you

5   make any complaints about that to anyone?

6       A.   No.

7       Q.   Are you aware of whether or not Transportation

8   Unlimited had any anti-harassment or discrimination policy?

9       A.   Am I aware?

10      Q.   Do you know one way or the other?

11      A.   No.

12      Q.   No, you don't know one way or the other?

13      A.   No.

14      Q.   Do you know if GAF MC had any anti-discrimination

15  policy when you were assigned to work there?

16      A.   I believe they had one.

17      Q.   Did you see it posted anywhere while you were

18  assigned to work there?

19      A.   Not that I can recall.

20      Q.   How did you know they had one?

21      A.   I'm sure they did because I have -- I can't recall

22  who was talking about it, but I heard them talking about it

23  before.

24      Q.   Is it anything that you ever read?

25      A.   I couldn't tell you if I read it or not.

1    Q.    Did you ever go to the office, the human resources

2    person or department at GAF MC and ask to see it?

3    A.    No.

4    Q.    Could you have done that?

5          MR. McNAIR:   Objection, speculation.

6    A.    I could go to the office anytime I wanted to,

7    yeah.

8    Q.    Do you remember who was in personnel in human

9    resources when you were assigned to GAF MC?

10   A.    I do, but reg think of her name right now.

11   Q.    There is a woman who works there now named Robin

12   Williams; would that have been the same person?

13   A.    I think she came in after.  I think there was

14   someone there before but --

15   Q.    Robin was there part of the time you were assigned

16   at GAF?

17   A.    I am trying to think if it was Robin that I'm

18   thinking of or Shirley.  Shirley I think was there too, but

19   they might be like both been there the same amount of time.

20   Q.    You knew them both to be in the human resources

21   department?

22   A.    I knew they were in the office.  I didn't really

23   go in that office except for when we needed toll money,

24   that's the only time I ever went in that office for the most

25   part.

1    Q.   Going back to the street talking manner, is there

2    anyone else who heard this or witnessed this?

3    A.   It's hard the tell because he would do it like odd

4    different times, couple times he did it.

5    Q.   I was going to ask you how many times.

6    A.   Several.

7    Q.   Can you estimate for me how times?

8    MR. McNAIR:  He already has.

9    MS. BECK:  Well, he's said a couple and several.

10   A.   Several is a couple, more than two.

11   Q.   Okay.  Less than ten?  What are we talking about

12   when you say several?

13   A.   It's hard for me to say, okay.  If I knew less

14   than ten, I could give you a number.  I couldn't tell you.

15   It was more than two.

16   Q.   How frequently do you think it happened?

17   A.   It's hard to tell that even, you know what I mean,

18   it happened.  It could have happened twice in one day and

19   not in another month or it could have happened once a week,

20   you know what I mean, it happened.

21   Q.   Did you make any complaint to Mr. Rinderle about

22   this?

23   A.   No.

24   Q.   Any complaints to anyone at GAF MC?

25   A.   No.

1      Q.   Anyone at TU?

2      A.   No.

3      Q.   The EEOC or the PHOC?

4      A.   No.

5      Q.   Did anyone else hear this or witness this?

6      A.   I'm sure they did.  I couldn't tell you who was

7 there.

8      Q.   Can you identify any witness at any time that this

9 happened?

10     A.   Most of the time anything that happened in that

11 office Greg was there, Tim was around a lot of times, and

12 Mike was there.

13     Q.   Did this take place in the office?

14     A.   Yes, it did, but it was on the floor in the break

15 room before too.

16     Q.   Okay.  So I asked you if it was in the office, you

17 said yes but it's actually a couple of places?

18     A.   Yes.

19     Q.   Again, tell me where.

20     A.   On the floor in the break room and the office.

21     Q.   You can't specifically identify any witnesses?

22     A.   No.

23     Q.   Any other --

24     A.   I'm almost positive that Lenny was there at the

25 time, Lenny VanCise.

1     Q.   Where?

2     A.   Because the one time I know he was on the floor

3    with me when he did it, we were standing together talking.

4     Q.   Any other time or anyone else?

5     A.   I can't recall at this time.

6     Q.   Did you ever hear Mr. Rinderle speak in this

7    manner to anyone else?

8     A.   No.

9     Q.   Do you know whether he did or didn't?  Have you

10   ever been told by anyone else he spoke that way?

11    A.   I never heard him do it.  Never was told he did it

12   to anybody else, just me.

13    Q.   Any other racial comments by Joe Rinderle,

14   Mr. Knight?

15    A.   Not that I can recall at this time, no.

16    Q.   I will give you a few minutes to think it because

17   it is pretty important.

18         MR. McNAIR:  He's answered the question.  Do you

19         have a question or are you done?

20    Q.   Any other racial comments or slurs?

21    A.   Not that I can recall.

22    Q.   How about any other individuals we have talked --

23    A.   Tim Maisner.

24    Q.   Let me finish my question.  We've talked about

25   Larry Murphy, John Whip, Joe Rinderle and now Tim Maisner.

1   What was his position?

2       A.   He was actually a loader, but he would take Greg

3   Gaurino's place when Greg was gone because he knew how to do

4   the computer.

5       Q.   Let me back up a little bit.  Larry Murphy was

6   another leased driver?

7       A.   Yes.

8       Q.   John Whip, what was his --

9       A.   A loader.

10      Q.   -- position?  Loader.  Mr. Maisner was a loader

11  but would sometimes work in the office for Greg Guarino?

12      A.   Yes.

13      Q.   Is that your testimony?  What did you hear

14  Mr. Maisner state?

15      A.   He would call chods, I guess that's the way he

16  said it.  I asked him what it was and he said that was some

17  kind of term for black man in Polish.

18      Q.   Was Mr. Maisner Polish, do you know?

19      A.   I believe he was.  He could speak it pretty

20  fluently.

21      Q.   And did he call you a chod?

22      A.   I was referred to, yeah.

23      Q.   By Mr. Maisner?

24      A.   Yes.

25      Q.   On how many occasions?

1    A.    Several.

2    Q.    Can you tell me any specifics?

3    A.    What do you mean?

4    Q.    Specific time and place when this took place?

5    A.    A specific time and place, no.  I mean, it was in

6    the office, it was in the lunchroom, it was while he was

7    loading a truck, it was all over.

8    Q.    Did anyone else hear this?

9    A.    I think that a few of the guys were familiar with

10   the term, sure.  Greg probably would be able to tell you,

11   they were familiar with the term.

12   Q.    I guess what I'm asking you is, well, I know what

13   I am asking you is, can you identify anyone else who heard

14   Mr. Maisner use the word chod?

15   A.    I'm saying that everybody is probably familiar

16   that worked down there with how he used that word.

17   Q.    Any incident where you can recall Mr. Maisner

18   using the word and there being someone else present?

19   A.    Like I said, several times everybody was present

20   that he used it.

21   Q.    Who would everybody be?

22   A.    That would be Roger Ellis, Rob Stempka, Ben

23   Clement, Charlie, John.

24   Q.    Charlie Potter, John Whip?

25   A.    Yeah.  Joe probably even knows the term.

1        Q.    Anyone else?

2        A.    Not that I can think of right now.

3        Q.    Was this used, in your opinion, in a derogatory

4    fashion?

5        A.    Yes.

6        Q.    How many times did Mr. Maisner -- did you hear

7    Mr. Maisner say this?

8        A.    Several.

9        Q.    Are you able to get anymore specific than that for

10   me?

11       A.    No.   More than ten.

12       Q.    Did you speak with Mr. Maisner about it?

13       A.    No.

14       Q.    Did you speak with Joe Rinderle about it?

15       A.    No.

16       Q.    Anyone at GAF MC?

17       A.    No.

18       Q.    Anyone at TU?

19       A.    (Witness moved head side to side.)   No.

20       Q.    EEOC or PHOC?

21       A.    You're saying speak to anybody while it happened

22   or after it happened, because I did speak to the EEOC on all

23   this stuff after I was --

24       Q.    During the time that you were assigned to work at

25   GAF MC.

1      A.   No, no.

2      Q.   I understand that you filed charges, a charge,

3  with the PHOC and the EEOC, that was done after you were no

4  longer assigned at GAF MC, correct?

5      A.   Yeah.

6      Q.   Any other racial comments by Tim Maisner?

7      A.   Not that I can recall at this time.

8      Q.   Any other racial comments by any other persons

9  with whom you worked at GAF MC?

10     A.   Not that I can recall.

11     Q.   Did the things that we talked about, these

12 comments, prevent you from performing your duties as a

13 driver?

14     A.   They bothered me.

15     Q.   Did they prevent you from performing your duties

16 as a driver?

17          MR. McNAIR:   I'm going to object to the question

18          as being unduly vague.

19     Q.   Were you able to come to work every day?

20     A.   I came to work every day.

21     Q.   Did you deliver the loads as requested and

22 instructed?

23     A.   Always did my job.

24     Q.   Would you agree with me that you were able to

25 perform your duties as a driver?

1       A.    There's a difference between performing and being

2   in a pleasant atmosphere and not, so sure I could do it.

3       Q.    Did you complain to anyone at any time while you

4   were assigned to work at GAF MC?

5       A.    You mean I made this complaint about the whole

6   situation or what kind of complaints are you talking about?

7       Q.    About what you referred to as the unpleasant

8   atmosphere, the racial comments that we discussed?

9       A.    Not really.

10       Q.    Did you quit at any time?

11       A.    No.

12       Q.    Were you friends with anyone that worked with you

13   down at GAF MC while you were assigned there?

14       A.    What do you consider friends?

15       Q.    Well, that's part of my question to you, whatever

16   you would consider friends.  Were any of your coworkers

17   friends of yours either through work or otherwise?

18       A.    They were acquaintances.  I knew some longer than

19   others.

20       Q.    Did you know some before you began -- before you

21   were assigned to work there?

22       A.    Yes.

23       Q.    Who would you have known before that?

24       A.    Greg Guarino, Lenny VanCise, Roger Ellis, that's

25   all I can think of -- Joe Rinderle.

1    Q.    You knew Mr. Rinderle before you started work?

2    A.    I didn't realize until we were talking one time.

3    We went to the same school.

4    Q.    Cathedral Prep?

5    A.    Yes.

6    Q.    Do you maintain any relationships with anyone that

7    was a coworker when you were assigned to GAF MC?

8    A.    As in what respect?  Do you say hi to them when

9    you walk by them on the road, sure.  Do I go out and drink

10   with them, no.

11   Q.    You don't maintain any social contact or

12   friendships with any of your former coworkers?

13   A.    Not at this time.

14   Q.    Have you since June of 2002?

15   A.    Have I went out with them or anything like that,

16   no.

17   Q.    Have you spoken with any of your former coworkers

18   since June of 2002 about your allegations in this lawsuit?

19   A.    No.

20   Q.    To your knowledge have any statements been

21   obtained of any of your coworkers since June 2002?

22          MR. McNAIR:  Objection.  It's work product

23          privilege.  We are not going to address that

24          question.

25          MS. BECK:  Well, actually, I noted that in your

100