1         discovery responses and we probably are going to

2         have to address it with the court then.  Any

3         witness statements are certainly not an attorney

4         work product.

5         MR. McNAIR:  You can talk to Roger Taft about

6         that, he certainly would disagree with you, but

7         any statements that Mr. Knight or I obtained in

8         the course of preparation for litigation would be

9         covered by the work product privilege.

10    Q.  Did you obtain any statements from anyone?

11         MR. McNAIR:  He's not going to answer the

12         question.  He is asserting the privilege as

13         identified.  Move on.

14    Q.  You did testify, Mr. Knight, you haven't spoken

15 with any of your coworkers since June of -- your former

16 coworkers since June of 2002, correct?

17    A.  No, that's not what I said.  You said about this.

18    Q.  Yes, you're right.

19    A.  That's exactly what you said about this.  I

20 haven't talked to them about this, but I've spoken to them.

21    Q.  On unrelated matters?

22    A.  Yes.

23    Q.  I had asked you if you maintain any personal

24 friendships or contacts or relationships with anyone.

25    A.  No, I don't.

1        Q.   So when you say you have spoken to them since

2   June 2002, in what context?

3        A.   How you been, what's going on, that's about it.

4        Q.   A casual --

5        A.   Very casual.

6        Q.   -- encounter in the community or something?

7        A.   Yes, yes.

8        Q.   Mr. Knight, you, as I understand it, on June 26th

9   of 2002 reported to GAF MC in the morning; is that right?

10       A.   I think it was the 28th, 29th.  I think I was

11  fired on the 26th.  That's the date they show up because

12  that's the date they're saying that I didn't call.

13       Q.   Let's back up again.  You reported to drive on

14  June 26th of 2002, correct?

15       A.   Yes.

16       Q.   What time did you report?

17       A.   I think we had to be there at 4:00 that morning.

18  Reg recall exactly what time, but I am pretty sure we had to

19  be there at 4:00.

20       Q.   A usual starting time?

21       A.   We were doing extra stuff, they wanted us there

22  early.

23       Q.   Did you run any loads that morning?

24       A.   Yes.

25       Q.   What happened thereafter?

1      A.    I told Joe I had to go at 8:30 for a hearing.    And

2  he said okay, and to get back as soon as I could or call if

3  I had a problem.

4      Q.    So your loads that morning were in town?

5      A.    Yes.

6      Q.    Did you go to the hearing at 8:30?

7      A.    Yes.

8      Q.    What was that?

9      A.    Hearing at the courthouse.

10      Q.    What was the hearing?

11      A.    Um, revocation.

12      Q.    Of?

13      A.    Of probation and parole.

14      Q.    You were on parole at the time -- were you on

15  parole at the time as a result of the 1997 convictions?

16      A.    Yes.

17      Q.    What were the grounds alleged for revocation of

18  your parole?

19      A.    Actually, I would call in because I was working

20  and try to reschedule.    Every time I rescheduled they said

21  that I was missing a hearing but I -- I mean missing an

22  appointment, but I really didn't miss an appointment so it

23  was actually work-related.

24      Q.    Okay.    Do I understand from that that the grounds

25  were missing meetings with your parole officer?

1       A.   Yes.

2       Q.   Who was your parole officer?

3       A.   I can't think of the name right now.  I could give

4   it to you, but I can't think of it right now.

5       Q.   I meant to ask you, do you remember the name of

6   the lawyer with whom you worked related to the Ohio

7   accident?

8       A.   No.  He was a big guy, deep voice, I couldn't

9   think of his name.  He is from Ohio.

10      Q.   That's not someone you contacted?

11      A.   No.  Someone they sent over.

12      Q.   Do you know who sent him?

13      A.   I was kind of --

14           MR. McNAIR:  I think we've already covered that.

15           Is there some reason to go over it again?  I think

16           you pretty much exhausted it the first time

17           around.  I think this is just unnecessarily

18           questioning.

19           MS. BECK:  I don't think I covered if he knew who

20           sent the lawyer.

21           MR. McNAIR:  I think you did but --

22           THE WITNESS:  Yeah, you did, you asked me.

23      Q.   Do you know who sent the lawyer?

24      A.   I'm not sure if it was GAF or Transportation

25   Unlimited.

1          Q.    Am I understanding your testimony correctly that

2    you paid him out-of-pocket?

3          A.    Yes, I did.

4          Q.    Do you know if either TU or GAF MC paid him

5    anything additional?

6          A.    I have no idea.

7          Q.    So on the morning of June 26th you go to the

8    hearing here at the Erie County Courthouse; is that right?

9          A.    Yes.

10         Q.    What happened at that time?

11         A.    The judge said he wanted me to keep my job and

12   that parole and probation wasn't for me.  He said two days

13   and I would be off all paper, and that's why he only gave me

14   two days.  So I went into the sheriff's office and called

15   Joe.

16         Q.    Wait a second.  I'm sorry to interrupt you,

17   Mr. Knight, but let me go back because I'm not sure I

18   understand what that means.  What judge were you in front

19   of, Connelly, Cunningham, DiSantis?

20         A.    DiSantis.

21         Q.    Okay.  He told you that parole and probation was

22   not for you?

23         A.    Exactly what he said.

24         Q.    What was your understanding what he meant?

25         A.    I guess he just didn't think it was working well

1    with the parole and probation.  He said he would give me two

2    days in jail and I would be off of paper completely.

3         Q.   That's another part, the off of paper, what do you

4    mean?

5         A.   Off of parole and probation.

6         Q.   So it's your testimony he told you they weren't

7    helping you or cooperating?

8         A.   No, just the way I work and everything else is --

9    the way I understood it was the way I worked and everything

10   else that I did I didn't have to be on parole and probation

11   to prove the points of the court so they took me off.

12        Q.   He told you that he would incarcerate you for two

13   days?

14        A.   So I could keep my job.

15        Q.   But you would no longer have to report to a parole

16   officer?

17        A.   Yes.

18        Q.   Why the incarceration for two days?

19        A.   I guess that was the payment for the rest of the

20   time.

21        Q.   You mean it wasn't exchanged for not having to

22   report thereof to a PO?

23        A.   Yes, yes.

24        Q.   Okay.  So what happened thereafter?

25        A.   I went upstairs to the sheriff's holding area.  I

1    called Joe and actually I asked Marty Davis, who was at the

2    counter, I asked if I could make a phone call to call my

3    boss. He said yeah. I called Joe up and I said Joe, I am

4    kind of screwed here. I need two days off. He said --

5    initially he said, you are really fucking me. I said, okay,

6    I said, but I really need this, this is something I can't

7    really handle. He said, okay, but you're fucking me. And

8    that was the extent of the conversation.

9        Q.   What day of the week was this, Mr. Knight?

10       A.   Wednesday.

11       Q.   This was a Wednesday?

12       A.   Yes.

13       Q.   You were asking for what?

14       A.   Thursday and Friday off.

15       Q.   Did you have to be immediately incarcerated on

16   Wednesday?

17       A.   Yes.

18       Q.   Anything else about that conversation that you

19   remember?

20       A.   Not at this time, no.

21       Q.   Did Joe Rinderle tell you that you had to speak

22   with Transportation Unlimited?

23       A.   No, he never did.

24       Q.   Did he tell you that he didn't have the authority

25   to grant you vacation?

1        A.    He always gave us our vacation days.

2        Q.    Did he tell you that he didn't have the authority

3    to grant your vacation?

4        A.    No.

5        Q.    Did you have earned vacation at that time?

6        A.    I had -- we can ask for days off anytime.

7        Q.    Let me ask you about that.  Are you telling me you

8    have unlimited personal days that are just unpaid?

9        A.    No.  It's not -- you take your vacation time in a

10    bulk and anytime you ask off after that is time you get off.

11    You take your pay, the days are still out there.

12        Q.    So my question was:  Did you have some earned

13    vacation?

14        A.    Yes, I did.

15        Q.    You had some accrued?

16        A.    I had days that I never took.  I only took a

17    couple days off, period, from the whole time I worked there.

18        Q.    Had you been paid for those days already?

19        A.    That's how it worked.

20        Q.    Okay.  If you were paid for those days, were you

21    still entitled to take them?

22        A.    Still never took them, yes.  You just didn't get

23    paid again.

24        Q.    With regard to unpaid days was there some

25    limitation by Transportation Unlimited or GAF MC on when you

1    could call and say, I am just not showing up, you don't have

2    to pay me today?

3        A.    No.    Because if I would have called in sick for

4    that day it would have been no problem.    I could have called

5    that morning and said I can't make it to work today.    You

6    have to be off three days before you need a doctor's excuse

7    or anything like that.    I could have called in and said,

8    hey, I am going to be off Wednesday, Thursday, Friday and

9    there would be no problem.

10        Q.    Was there any requirement about advance notice for

11    calling off?

12        A.    Not that I know of.

13        Q.    Was there some kind of limitation on the number of

14    sick days?

15        A.    I couldn't tell you that either, but I never took

16    sick days.

17        Q.    You don't know if there was a limitation on sick

18    days?

19        A.    I can tell you my point, in my case I never was

20    off work.    I never took sick days or anything like that.

21        Q.    Do you know if there was a limitation on the

22    number of unpaid personnel days?

23        A.    Never was brought up.

24        Q.    You don't know?

25        A.    No.

1    Q.   Do you know how much accrued vacation you had at

2  that time?

3    A.   A week at least.

4    Q.   It's your testimony that Mr. Rinderle said, okay,

5  you can have vacation?

6    A.   No, that's not what I said.

7    Q.   Okay.

8    A.   He said I was fucking him, but I could take it

9  off.  He didn't say okay I could have vacation.  He said --

10  this is his exact word, you're fucking me, but you can have

11  the days off.

12    Q.   There was no discussion about Transportation

13  Unlimited?

14    A.   No, none.

15    Q.   Were you incarcerated then immediately?

16    A.   Yes.  I was already incarcerated.

17    Q.   Until when?

18    A.   Till Friday afternoon.

19    Q.   Then during that period of time did you have any

20  further contact with anyone from GAF MC?

21    A.   No.

22    Q.   Anyone from Transportation Unlimited?

23    A.   No.

24    Q.   And then what is the next contact you have with

25  Greg?

110

1       A.   Came to work on Saturday and he told me I was

2  fired.

3       Q.   So you come to work on what time Saturday?

4       A.   On time, I think it was 4:00 or 6:00 in the

5  morning.

6       Q.   With whom did you speak?

7       A.   Only Roger Ellis.

8       Q.   Was he the leadman that weekend?

9       A.   Yes, he was.

10      Q.   What did he tell you?

11      A.   That I was done.

12      Q.   What was the rest of the conversation?

13      A.   That's the conversation.

14      Q.   He said you're done and you said, okay, and walked

15  out the door?

16      A.   I said, I'm done; what's that mean.  He goes, as

17  far as I know you're done.  I said, what are you talking

18  about, Roger.  He said, you're done because nobody knew

19  where you were.  I said, Roger, I called in.  He said, well,

20  you're done.  You got to call Ken on Monday, is what he

21  said, Ken Joint.

22      Q.   You have to call Ken on Monday, yes?

23      A.   Yes.

24      Q.   Any discussion about Transportation Unlimited with

25  Fred Ellis?

1        A.    No.  Roger Ellis.

2        Q.    Excuse me, Roger Ellis.  Any other discussion with

3   Roger Ellis?

4        A.    That's about it.

5        Q.    Did you talk about your conversation with Joe

6   Rinderle with Roger Ellis?

7        A.    No.  I don't think.  I might have, but I don't

8   recall.  I was pretty upset.

9        Q.    What is your next contact with GAF MC?

10        A.    I called Joe at home.

11        Q.    On Saturday?

12        A.    I believe so.

13        Q.    What was that conversation?

14        A.    He was too hung over.

15        Q.    Did you speak with Joe?

16        A.    Yes.  He said to call him back at 1:00 or

17   something because he was too hung over from the night

18   before.  I called him back at 1:00, I got no answer.

19        Q.    Did you speak with him at all that weekend on the

20   phone?

21        A.    That's exactly what I just said, I spoke with him.

22        Q.    You called him in the morning?

23        A.    Yep.

24        Q.    He said to call him back?

25        A.    Because we was too hung over.

1     Q.   I understand that.  Did you have any conversation

2   about your meeting with Roger Ellis?

3     A.   I told him, I said, Joe, what is going on.  He

4   says, well, I'm too hung over, I can't talk right now.  Call

5   me back at 1:00 and we'll talk.  I called him back at 1:00

6   and he didn't answer the phone.

7     Q.   Did you call him again?

8     A.   Yeah, and he didn't answer the phone.  I called

9   him twice after that and he never answered the phone.

10     Q.   Did you speak with him at all again on the phone

11   that weekend?

12     A.   No.

13     Q.   Or any person?

14     A.   No. I called Kenny Joint.

15     Q.   When was that?

16     A.   Same day.

17     Q.   Saturday?

18     A.   Yes.

19     Q.   Did you call him at home?

20     A.   I called Kenny at home but he said he couldn't

21   talk because he had to move or was in the middle of moving.

22     Q.   Did you have any discussion about your

23   incarceration talking with Joe, talking with Roger?

24     A.   No.

25     Q.   Any other contact with anyone from GAF MC that

1    weekend?

2         A.    Not that I can think of.

3         Q.    Any contact with anyone from or representing

4    Transportation Unlimited that weakened?

5         A.    I talked to Carlo but I can't remember if it was

6    that weekend or Monday.

7         Q.    Tell me about your discussion with Carlo.

8         A.    I talked to Carlo and Carlo said he would try to

9    get me back in.  He'd call and talk to Joe, then he called

10   me back and said Joe doesn't want you.

11        Q.    Was this by phone?

12        A.    Yes.

13        Q.    And you don't know if it was that weekend or

14   Monday?

15        A.    I'm not sure.

16        Q.    Would it have been either that weekend or Monday?

17        A.    It's in that area.

18        Q.    Tell me how that call was initiated.  Did you call

19   Carlo?

20        A.    I called Carlo.

21        Q.    Where is he located?

22        A.    New Jersey as far as I know.

23        Q.    You had a phone number or obtained it from

24   someone?

25        A.    Yes.

1      Q.   Who?

2      A.   I had it in my wallet.

3      Q.   When you called him, was he already familiar with

4 the situation?

5      A.   No, not that he acted like.  I couldn't tell.  He

6 might have knew everything going on, period, but as far as I

7 know, no.

8      Q.   What did you tell him?

9      A.   I told him exactly everything that happened,

10 everything that happened from me getting incarcerated for

11 two days and calling Joe and he said that it would be okay

12 to take two days off, and then coming back and them telling

13 me that the nobody knew where I was when I'd called already

14 and told them.  He said, okay, let me call Joe and see

15 what's going on.  So he called Joe and he called me back,

16 and it wasn't right away, it was maybe an hour or two he

17 called me back.

18      Q.   Where were you, at home?

19      A.   I was at home.  And he called me back and said Joe

20 doesn't want you on the thing anymore.  He said -- then he

21 said something else, I'm trying to think exactly how he said

22 it, but it was to the point where he said, don't worry,

23 they're probably going to get rid of that leasing anyway so

24 don't feel so bad.  Then I talked to --

25      Q.   Was that -- before you move on, Mr. Knight -- was

1    that all the conversation with Carlo?

2        A.    As far as I can remember.

3        Q.    The person that told you that, per your testimony,

4    that they didn't know where you were was Roger Ellis?

5        A.    Yes.

6        Q.    So Carlo, per your testimony, contacted Joe and

7    then called you back?

8        A.    I called Carlo, he called Joe, and then he called

9    me back.

10        Q.    And he indicated that Mr. Rinderle didn't want you

11    to return to work?

12        A.    Right.

13        Q.    Did you ask why; did you have further discussions?

14        A.    I kind of knew why, but it's just -- I asked

15    Carlo, I said, is there anything you can do.  He said, if

16    Joe don't want you, reg do nothing.  That's exactly what he

17    said.

18        Q.    Did he say anything else?

19        A.    (Witness moved head side to side.)

20        Q.    Then you spoke with whom?

21        A.    After that I spoke with Transportation Unlimited.

22        Q.    Did Mr. Melia raise Transportation Unlimited at

23    all, tell you to call them?

24        A.    No, he didn't.

25        Q.    So at this point no one has told you to call TU?

1        A.    No.

2        Q.    Is that correct?

3        A.    Yes.

4        Q.    And so who do you call at TU?

5        A.    I think that's when I talked to Glenn Pauley

6    again.  I talked and he said, well, you know they want you

7    off this leasing.  But he said, we got other things around

8    we can probably get you hooked up with something around

9    Pittsburgh or Cleveland area.  I said, well, that ain't

10   going to do me no good.  I got to relocate, I'm not

11   relocating.  He says, well, let me take a look, I'll call

12   you back in about a week and see what's going on, if there's

13   anything in your area, and that was the last time I talked

14   to him.

15       Q.    That was the same day?

16       A.    Yes.

17       Q.    I'm sorry, Mr. Knight, he told you -- did he tell

18   you that anyone from GAF MC had contacted him already?

19       A.    No, he didn't.

20       Q.    Did he know any of the situation?

21       A.    Like I said, reg tell you what he knows and don't

22   know.  He didn't indicate it.

23       Q.    So this is Glenn Pauley with whom you had spoken

24   to?

25       A.    I believe so, I am not positive.

1        Q.    You told him what had happened?

2        A.    Exactly what happened.  And he said, well, if they

3    don't want you we can't do nothing about it.  He said I

4    could be put on another lease.

5        Q.    You could be reassigned?

6        A.    Right, if I relocated.

7        Q.    So that was not an option --

8        A.    No.

9        Q.    -- to you to relocate?  Would you actually have to

10   report somewhere else in the morning or just drive to a

11   further location?

12       A.    They were saying you had to relocate, complete

13   relocation.

14       Q.    Then he told you that he would look for something

15   more locally?

16       A.    He said he would get back to me if he could find

17   anything local.

18       Q.    Did he ever?

19       A.    No.

20       Q.    Did he indicate to you that you were no longer

21   employed by TU?

22       A.    No, I was employed by TU.

23       Q.    But you just were not assigned anywhere?

24       A.    Right.

25       Q.    What is the next contact you had?

1        A.    Ken Joint.

2        Q.    When was that?

3        A.    I went in and saw Ken like they told me on Monday.

4    Ken said that I was fired.  And he said -- we sat and talked

5    and he said, well, I could have an application to work in

6    the other part of the shop, but I was done with the leasing

7    drivers in the back.  Which made no sense to me, I don't

8    understand how you give me an application, fire me from one

9    part of the shop and then offer me an application in

10   another.

11       Q.    So this is on Monday and you go to the Erie

12   facility --

13       A.    Yes.

14       Q.    -- on Bayfront Highway and you meet with Ken

15   Joint?

16       A.    Yeah.

17       Q.    Anyone else present?

18       A.    Not that I can recall.  I don't think so.

19       Q.    He says to you that you can be given an

20   application?

21       A.    To work in the shop, but my lease back with Joe

22   was done.

23       Q.    That would be -- would that have been, if you

24   know, GAF MC application?

25       A.    I believe so.  I mean, that's all he said.

1      Q.   Did you take one?

2      A.   I did.

3      Q.   Did you fill it out?

4      A.   No.

5      Q.   He said what about no longer working in the

6  shipping department?

7      A.   That's what he said.

8      Q.   You no longer can?

9      A.   (Witness moved head up and down.)   Right.

10      Q.   Did he raise Transportation Unlimited at all?

11      A.   No.  Not that I can recall.

12      Q.   Did he tell you why you could no longer work in

13  shipping?

14      A.   He just said -- I can't recall the exact words

15  that he said about that.  He didn't really make a big deal

16  out of why I couldn't work back there, he just said I

17  couldn't.

18      Q.   Did he give you any reason?

19      A.   Not that I can recall.

20      Q.   You testified, I think a short time ago that he

21  said to you you're fired.

22      A.   Yeah.

23      Q.   Did I recall your testimony correctly?

24      A.   He said that I was fired or let go, whatever words

25  you want to use.

1    Q.    What words did he use?

2    A.    Who, Kenny?

3    Q.    Yes.

4    A.    I believe it was let go, might have been his exact

5    words.

6    Q.    Did he say by whom?

7    A.    Reg recall.  But he said Joe doesn't want you back

8    there, I know that.

9    Q.    Mr. Knight, did you ask why that was the case when

10    Mr. Joint told you that Joe didn't want you in shipping?

11    A.    I told him I called him.  And he said, nobody knew

12    where I was is what he said.

13    Q.    Mr. Joint?

14    A.    Yes.

15    Q.    Any other parts of this conversation?  As I ask

16    more questions more of it comes out, so think about the

17    conversation and tell me anything and everything you

18    remember.

19    A.    Reg think of anything else.

20    Q.    Any other contact with GAF MC?

21    A.    I don't think so.

22    Q.    Any other contact with Transportation Unlimited?

23    A.    Not after they said they would call me back in a

24    week, that was about the last thing -- last time I talked to

25    them.

1    Q.    Was that the last time?

2    A.    Um-hmm.

3    Q.    They didn't get back to you in a week?

4    A.    No, I don't think so.  I mean, I know that they

5    didn't get back to me in a week.  I don't think I had any

6    other contact with them.

7    Q.    Did you ever speak at any time after that initial

8    phone call on Saturday with Joe Rinderle?

9    A.    I don't know if I talked to him on that Monday or

10   not.  I don't think I did.  I don't think so.

11   Q.    Did you speak with anyone else that Monday?

12   A.    Ben.

13   Q.    Ben Clement?

14   A.    Um-hmm.

15   Q.    Was that at the GAF MC facility?

16   A.    No.  He was at the other one.  He was down the

17   road at Lord's.

18   Q.    Why were you at Lord's?

19   A.    I was talking to Ben.

20   Q.    Did you do that before or after you saw Ken Joint

21   while you were still at the Bayfront facility did you speak

22   with anyone else?

23   A.    Not that I can recall.

24   Q.    Then I understand you went to the Lord facility to

25   see Ben Clement?

1    A.    Yeah.

2    Q.    What was that conversation?

3    A.    Just asked him if he knew what was going on and

4  what he had heard.  That was about it, I left.

5    Q.    What did Ben say?

6    A.    He said he heard that I got fired, and he heard

7  that nobody knew where I was exactly.  And he asked me if I

8  was going -- he asked me what I was going to do and I said,

9  I don't know.

10    Q.    Anything else from that conversation?

11    A.    Not that I can recall at this time.

12    Q.    Had he spoken with anyone about it, did he he

13  indicate?

14    A.    I would imagine that -- no, he didn't.  He didn't

15  indicate that he spoke with anybody.

16    Q.    Mr. Knight, could you have gone back to work then

17  somewhere else for TU?

18          MR. McNAIR:  I think we already covered that.

19    A.    Other than relocation?

20    Q.    Right.  Was there some kind of time limit that you

21  were under to be reassigned or could you call them up and

22  they could reassign you?

23    A.    Right.

24    Q.    It's alleged in the Second Amended Complaint that

25  on July 31 of 2002 you were terminated under the pretext

1    that you exceeded your cell phone usage and that there were

2    attendance problems.

3        A.    I wasn't terminated on July 31.

4        Q.    Let me show you the document filed by your

5    counsel.

6        A.    That's the following Monday is what you are

7    saying?  Oh, I see what you are saying.  You mean the

8    official?

9        Q.    Well, I think perhaps the date is wrong.  See in

10   16 on Saturday, June 29 the plaintiff was suspended and then

11   terminated on Monday, July 31.

12       A.    I see what you are saying, yeah.

13       Q.    So would it be the case that this July 31 should

14   be June 31 (sic)?

15       A.    No -- yes.  Wouldn't that be June 31?

16             MR. McNAIR:    Yes.

17       A.    Yes, yes.

18       Q.    On Saturday, this alleges in Paragraph 16, Second

19   Amended Complaint, on Saturday, June 29 plaintiff was

20   suspended.  Who advised you on Saturday you were suspended?

21       A.    Roger is the one that said I was done, and that I

22   had to talk to Ken on Monday.

23       Q.    Okay.  Any specific discussion about suspension?

24       A.    I don't know if there was a suspension mentioned.

25   All I can remember him saying was you're done.

1    Q.    And then terminated on Monday, should be, June 31,

2    2002?

3    A.    Um-hmm.

4    Q.    Under the pretext that he exceeded his permitted

5    cell phone usage.  It was also alleged the plaintiff had

6    missed work without calling in as required.  You didn't tell

7    me anything about any discussions about cell phone usage; do

8    you recall that?

9    A.    I see what you are saying -- pardon me?

10    Q.    Do you recall any?  I mean, your counsel has

11    showed you the unemployment compensation findings of fact it

12    looks like.  My question to you is:  We just went through

13    all the discussions, all the contacts you had, did someone

14    raise cell phone usage?  Where does that come into play, if

15    at all?

16    A.    Well, the cell phone usage came in before and just

17    said I would have to pay for my overages and stuff like

18    that.  But that was -- when I talked to Ken on Monday, I

19    can't remember if he mentioned it or not, but I know they

20    took my last paycheck.

21    Q.    To cover the excess cell phone coverage?

22    A.    They never told me why, they just took it.

23    Q.    Do you recall discussions about excess cell phone

24    usage with Ken Joint that Monday?

25    A.    No, because that was nothing to be terminated

1  over.  The cell phone was nothing but either you had it or

2  you didn't or you pay for the bill, but it was nothing to be

3  terminated over.

4      Q.   Were you told you're taking off the account, you

5  are no longer assigned to GAF MC because you used your cell

6  phone too much?

7      A.   No.

8      Q.   There is an allegation also at Paragraph 9 of the

9  Second Amended Complaint that defendant Joe Rinderle is an

10  employer of the plaintiff, yourself, pursuant to the terms

11  of the Pennsylvania Human Relations Act.  Was your

12  understanding that Joe Rinderle was your employer at any

13  time?

14      A.   Yes, he was my employer.

15      Q.   Okay.  As part of GAF MC or somehow in addition

16  to?

17      A.   Of course, he is in addition to and part of GAF.

18      Q.   You mean just in his role as supervisor at GAF MC?

19           MR. McNAIR:  Objection.  That mischaracterizes his

20           testimony.  We've already answered the

21           interrogatories, you're asking for a legal

22           conclusion.  And the paragraph as we answered in

23           the interrogatory indicates that he has liability

24           under the Pennsylvania Human Relations Act as if

25           he was an employer.  I am sorry I didn't make

1              myself clear, but I'm not going to have you grill

2              my client about questions of law.

3              MS. BECK:  Okay.  Tim, calm down.  I'm asking

4              Mr. Knight --

5              MR. McNAIR:  I am not agitated in the least.

6              MS. BECK:  I am asking Mr. Knight about whether he

7              had any other sort of employment with Joe

8              Rinderle.

9              MR. McNAIR:  Okay.  Well, then ask that question.

10             MS. BECK:  I will ask just how I see fit to ask

11             it.  If you would let me finish, you could lower

12             your blood pressure.

13        Q.   Mr. Knight, did you have any sort of other

14   employment with or for Mr. Rinderle?

15        A.   No.

16        Q.   Mr. Knight, there's an allegation that

17   Mr. Rinderle assigned preferred runs to Caucasian drivers.

18   What is meant by you by preferred run?

19        A.   Anything out of town is preferred.

20        Q.   When you were assigned to GAF MC, what were the

21   preferred runs?

22        A.   Anything out of town, Detroit, Columbus,

23   Cincinnati, anything longer than normal.  I mean, like a

24   four or five hour trip is a good run because you leave

25   earlier, get more hours.  And we got paid by the hour so

1    that's a preferred trip.

2        Q.    Because it required more hours?

3        A.    More time and you get paid more, your overtime was

4    higher.

5        Q.    The shuttles in town were those -- those were also

6    paid hourly, correct?

7        A.    Yes.

8        Q.    Were those ever early in the morning or late at

9    night or those just necessarily meant a shorter day?

10       A.    When they were early in the morning or late at

11   night, it was everybody did the same.  When you make a run,

12   you're doing your individual overtime.  So if you made a

13   run, even if you were running -- if everybody did 4:00 to

14   6:00 every day, if you made a run you can leave at midnight

15   and get those extra hours between 12:00 and 4:00.  So you

16   have four extra hours.  If there was a shuttle in town, and

17   everybody had to be there at 4:00 because basically

18   everybody when we worked early everybody had to be there

19   early so there was no extra overtime, you weren't getting

20   any extra.

21       Q.    At any given time, and if I am incorrect, let me

22   know, there were four leased drivers once Lenny VanCise

23   joined Larry, yourself and Dennis, correct?

24       A.    Um-hmm.

25       Q.    Could some of you guys be out on these runs and

1    some be doing shuttle?

2        A.    Yes.

3        Q.    Then there was some occasions where you would all

4    be doing shuttle?

5        A.    Very rare, but yes.

6        Q.    Were there occasions where you would all be on

7    runs?

8        A.    Another very rare, but yes.

9        Q.    More common was some were doing some shuttling and

10   some were doing runs?

11       A.    Yes.

12       Q.    Your allegation again is that Joe Rinderle

13   assigned the preferred runs to the Caucasian drivers; is

14   that right?

15       A.    Yes.  There was no other black driver so,

16   Caucasian drivers, anybody else that was there.

17       Q.    Is it your position that you had more runs out of

18   town under Ben Clement then?

19       A.    Not more, fair.  Everybody was equal.

20       Q.    Everybody was equal, okay.  Tell me what this

21   allegation is, what was unfair, what was different?

22       A.    That I stayed in the yard a lot more than I used

23   to while everyone else was running the road, which actually

24   took money from my pocket, and doing yard work is a lot

25   harder.

1       Q.    Okay.  So, again, under Ben Clement were other

2    guys in the yard more?

3       A.    Under Ben everybody had an equal -- if you were in

4    the yard for Tuesday and Wednesday you were usually on the

5    road Thursday and Friday, put it that way.  Now, under Joe I

6    was in the yard for weeks at a time straight.  Even Lenny

7    was running and I am still in the yard.  Lenny was under me.

8       Q.    There was an allegation about seniority.  Tell me

9    top to bottom how that went.

10      A.    Lenny, me, Larry, Dennis.

11      Q.    Dennis being the most senior?

12      A.    Yes.

13      Q.    And these runs, as well as the shuttles, that

14   would all be as recorded by you on the weekly driver's logs?

15      A.    Yep.

16      Q.    You told me already, I believe, that you recorded

17   those accurately to your knowledge?

18      A.    Yes.

19      Q.    Have you ever made any attempt, Mr. Knight, to

20   total up those numbers and see how you compared with the

21   other three drivers?

22      A.    No.  You mean total, total completely, no.  I

23   don't think we have access to the other driver's information

24   for one thing.

25      Q.    Did you keep track of your own separate from the

1    weekly driver's log?

2        A.    When I was down there, yes.

3        Q.    Separate from the weekly driver's log, which I

4    understand was submitted to GAF MC, right?

5        A.    Yes.

6        Q.    Did you keep some other log or record?

7        A.    No.   Just the log book myself, my own log book.

8        Q.    That is some other log or record.

9        A.    You said separate to the log.

10       Q.    Okay.   There is the weekly driver --

11       A.    When you do your log book, it comes out of your

12    book and you keep a copy of it.   So that's not separate to

13    the log.

14       Q.    Do you maintain or have in your possession a

15    record of your runs today?

16       A.    I believe so.   I'm not positive.

17       Q.    And I kind of envision something where you record

18    where you go when, and you use that to fill out these weekly

19    logs?

20       A.    No.   The log book actually came out, got pages of

21    our log books and they were stored inside the office.   When

22    it got so many they do something with them, I don't know

23    what they did with them.

24       Q.    You kept copies of those?

25       A.    Yeah, for the most part.

1    Q.    Did you actually take those to a Xerox and copy it

2    or would you make handwritten notes?

3    A.    No.  When you take -- the log has copies, like say

4    it's tri-copied.  When you write in the log, you rip the

5    page out and give it to --

6    Q.    Carbon.

7    A.    -- and there's still pages in there that you have

8    to keep for DOT inspection and everything else.

9    Q.    Carbon copies?

10   A.    Those would actually be the originals, I think the

11   carbon copies comes out.

12   Q.    You think you have those somewhere?

13   A.    I think so.

14         MS. BECK:  I can make a request, second request

15         for production, but I'll put on the record now

16         that we request copies of those.

17   A.    It's quite a bit, you have to realize that's every

18   month.

19   Q.    I understand.

20   A.    There's a book every month.

21   Q.    Well, whatever you would have.

22   A.    Okay.

23   Q.    Are there other -- there were some allegations in

24   your original and Second Complaint about improper jobs or

25   bad jobs an hour; is that related to shuttle versus long

1  distance or --

2  A.   There was some actually real crappy jobs, like

3  going over to this T place on over here, I can't think of

4  the name of it.  It's right here on 17th or 16th and French,

5  and it is really tight to get into and then you sit there

6  for three hours or four hours trying to wait for them to

7  load it.  There was a paper company we used to get stuff

8  from, just stuff like that.  There was times I had to tarp

9  other people's load so that they'd be ready to go, and I'd

10  still stay in the yard, you know what I mean?  That was like

11  the biggest slap in the world, I mean, you can't even tarp

12  your own load to go, 'cuz you want to get out of the yard,

13  but you have to tarp someone else's so they can pull up and

14  they're gone, you know.

15  Q.   Did anyone else do tarping for other people?

16  A.   Lenny would do it because he would help me.  Lenny

17  would help, Lenny always would help.  No matter what Lenny

18  would help anybody.

19  Q.   Anyone else do any tarping for anyone else at any

20  time?

21  A.   Not that I can recall.  Dennis would do his.

22  Larry would do his.  Seemed like whenever anything else

23  extra was done it was me or Lenny, but mostly me.

24  Q.   Okay.  Any other improper or bad jobs and hours,

25  that's just a general allegation in your Complaint?

1       A.    Different places to go that are terrible and there

2  are places that you go that are good.

3       Q.    You are talking about specific destinations?

4       A.    Some.

5       Q.    Do you have any kind of documentation or

6  anything --

7       A.    The log book will show you everything.

8       Q.    -- anything to establish that you were sent to

9  these places and others never were?

10      A.    The log book will show.  Actually, well, because

11 when you're in the city it ain't going to tell you where we

12 went to.

13      Q.    Do you have any documentation?

14      A.    I don't know if I do or not.  I might have written

15 it in or not because you wait so long up there, I think I

16 might have written it in.  I have to take a look at my logs

17 and see.

18      Q.    If you have any, it would be in the logs that you

19 kept?

20      A.    I believe so.

21      Q.    What were these bad destinations, bad jobs?

22      A.    That was one of them?

23      Q.    That was T?

24      A.    I can't think of the name of it.

25            MR. RINDERLE:   Quin-T.

1      A.    Quin-T, that's it.

2      Q.    What were the others?

3      A.    Going on over the -- lot of times going over to

4    the sand docks was terrible, and other times when you went

5    over to Raspberry.  When you are doing shuttles to

6    Raspberry, you had to pick up something for down here at

7    Raspberry.  You actually had to sit in the street and the

8    cops would come by and yell at you because you're sitting in

9    the street.  But it got like that down here sometimes it was

10   so bad, that was the big hassle of doing shuttles.  It got

11   so busy you really couldn't do shuttles anymore and they

12   wouldn't send us on the road.  Like Dennis wouldn't really

13   be, Larry would always be on the road, every once in a while

14   Lenny would be on the road, but I'm stuck here constantly.

15     Q.    Did you have any discussions with Joe Rinderle

16   about it?

17     A.    We asked him.  He said he was going to -- Mike was

18   going to do something.  Carlo called and he showed up and we

19   had pizza one time, it really didn't matter.  It was a

20   three-week fix and everything went back to the same way it

21   was.

22     Q.    What do you mean it was going to change; are you

23   talking about the carrier was going to change?

24     A.    No.  That we were going to get back to everybody

25   doing an equal amount of everything.

1     Q.    Okay.  So you said we talked to Joe about it or

2  complained to Joe about it.

3     A.    Yeah.

4     Q.    Who is we?

5     A.    That's the drivers.

6     Q.    All four?

7     A.    Yes.

8     Q.    So all four of you complained to Joe that some

9  were doing too much runs and some were doing too much

10 shuttles?

11    A.    That and it was the shuttles -- I mean the

12 shuttles, the runs we were giving away too.

13    Q.    I don't get that part.

14    A.    You wouldn't understand that part.

15    Q.    You have to explain it to me.  Giving runs away to

16 other trucking companies?

17    A.    Yes.  Instead of us shuttling all the time we

18 could have been running short runs which would involve like

19 Dunkirk, anything within 50 miles.  You could still run out,

20 come back and shuttle whatever they wanted done instead of

21 staying in this yard all the time and doing it and they

22 would give away the little short runs to like Dunlap

23 Trucking and whoever.

24    Q.    That was a complaint, as I understand your

25 testimony, that all four of the lease drivers had?

1    A.    Everybody gave it to them because they knew how I

2   felt about staying in the yard and they knew how Lenny felt

3   about staying in the yard.  Larry almost wouldn't stay in

4   the yard.  He would get out of the yard every time, Larry

5   and Dennis, there were very few times they were.

6        Q.    Larry and Dennis were the two most senior?

7        A.    Yes.

8        Q.    You said there was a meeting with Carlo?

9        A.    Carlo came down, yeah.

10       Q.    Any idea when this was?

11       A.    No, couldn't tell you.

12       Q.    Any changes made thereafter?

13       A.    Three weeks maybe, three-week fix and it's back to

14   broke again.

15       Q.    So you and Lenny were spending a lot of time in

16   the yard?

17       A.    Yes.

18       Q.    Doing the shuttles?

19       A.    Yes.  Lenny would get out of the yard more than I

20   did.

21       Q.    Although, again, you haven't actually had an

22   opportunity to review all the driver's logs and compile

23   those numbers.

24       A.    To actually put a number against a number, no, I

25   haven't.

1      Q.   It is your allegation that you were doing more

2   shuttle work because of your race?

3      A.   What other reason would there be?

4      Q.   What do you have to support the allegation --

5      A.   I was the only black guy.

6      Q.   If I could finish my question, Mr. Knight.  Can

7   you point to me evidence or discussions that supports the

8   idea that you were doing more shuttle work or less long

9   distance work because of your race?

10      A.   I was the only black guy down there.  We all drove

11   equal.  We all could put the trucks away.  We all could

12   park.  There was no reason not to send somebody there.  I

13   could see if they said, oh, maybe because he can't do this

14   or maybe he can't drive here or he has problems in this

15   part, everybody was equal as far as driving ability and

16   every other ability.  So what other reason was there?

17          MR. McNAIR:  Is your question is there a

18          legitimate nondiscriminatory reason for his

19          disparate treatment?

20          MS. BECK:  I asked him what evidence he had to

21          support the allegation that it was because of his

22          race.

23          MR. McNAIR:  I would refer you to the past three

24          hours, three and half hours of deposition.

25      Q.   Mr. Knight, your testimony is that the four leased

1    drivers had equal driving skills and abilities?

2        A.    Yes.

3        Q.    And do I understand that when Ben Clement was the

4    supervisor it was your belief or understanding that the runs

5    out of town and work in town was more equal amongst the

6    drivers?

7        A.    Yes.

8        Q.    And that changed with Mr. Rinderle's supervision?

9        A.    Yes.

10       Q.    Mr. VanCise is Caucasian, isn't he?

11       A.    Yes.

12       Q.    There is information in some of the materials from

13   EEOC that you believe Mr. VanCise was tardy or absent and

14   not penalized in any way; is that right?

15       A.    That's true.

16       Q.    Tell me about that.

17       A.    He would come in late, leave early.  He actually

18   was missing a day or two and they never said nothing to him.

19   Matter of fact, when I left I think they put him in charge

20   of the trucks.

21       Q.    Do you know what he's currently doing?

22       A.    Driving for Dunlap.

23       Q.    He's no longer at GAF MC?

24       A.    No, he is not at GAF anymore.

25       Q.    Tell me when the drivers came in, is it the case

1    that you all reported at the same time so you would know who

2    was there when or did you come and go at different times?

3        A.    Came and went at different times.

4        Q.    So how was it that you could keep track of

5    Mr. VanCise's attendance?

6        A.    Once we got there we came in and went at different

7    times.  When we were scheduled to be at work, if everybody

8    is supposed to be there at 6:00, everybody was supposed to

9    be there at 6:00.  If somebody is missing at 6:15, they're

10   late.

11       Q.    So everyone was scheduled to appear at the same

12   time?

13       A.    Yes.

14       Q.    Unless they were on --

15       A.    An outside run that needed more time to get there

16   and get back.

17       Q.    Do you know whether any disciplinary measures were

18   every taken by Transportation Unlimited with regard to

19   Mr. VanCise?

20       A.    Prior to me leaving, no, I don't.  I know he

21   didn't get fired.

22       Q.    Okay.  Do you have any knowledge whether any were

23   ever taken?

24       A.    What do you mean?

25       Q.    With regard to Mr. VanCise, any disciplinary

1    measures by Transportation Unlimited?

2           MR. McNAIR:  Single instance of not coming to work

3           for two days?

4           MS. BECK:  Mr. VanCise.

5           MR. McNAIR:  Right.

6        Q.   Do you know whether he -- I am asking him if he

7    has any knowledge whether any discipline was ever taken

8    against Mr. VanCise as he has alleged that the company

9    treated him more favorably.

10       A.   After I left I know he's no longer with GAF, but I

11   don't know what the circumstances are behind it.

12       Q.   You don't know the reasons for that or

13   circumstances of it?

14       A.   Unh-unh.  I mean, I couldn't tell you because I

15   never talked to him so I couldn't tell you.  I have heard

16   things but --

17       Q.   What have you heard?

18       A.   It was over drinking.

19       Q.   You haven't spoken with Mr. VanCise about it?

20       A.   No.

21       Q.   There is a representation in the Second Amended

22   Complaint that Caucasian employees were allowed shingles for

23   personal use, but you were not?

24       A.   Yes.

25       Q.   Tell me about that.

```
1       A.   There was a bunch of shingles over at the sand

2   docks and some shingles down here that were supposed to be

3   get rid of.  Everybody was to get them, no matter what you

4   could get them.  I put my thing in, you had a little gate

5   pass you had to go and get everybody to sign.  I got them

6   signed and Joe refused to give me mine.  I even went over

7   there and I said, Joe, I'm going over there now, can I bring

8   back my shingles I'm going to have room in my truck.  No,

9   no, but everybody else was getting their shingles and

10  leaving with it.  I was even bringing over peoples shingles

11  so they could get it, but I couldn't get mine.

12      Q.   Did you talk to Joe about why --

13      A.   Several times.  And he kept saying, you're going

14  to get it, there don't worry big guy, you're going to get

15  it, but I never did.

16      Q.   What's the gate pass that everyone needed to sign?

17      A.   You are allowed to get free shingles.

18      Q.   Is that what a gate pass means?

19      A.   Yes.  He refused mine.  Everybody else got theirs,

20  he refused mine.

21      Q.   Did you ever receive any free shingles?

22      A.   When Ben was there.

23      Q.   At any time after Joe came to work in the shipping

24  department did you receive any shingles?

25      A.   No, I didn't.
```

1    Q.    How often does this happen that people get

2    shingles and take them home, is this a regular thing or?

3    A.    Pretty regular.  I mean, if you needed shingles

4    and you had a building -- if you had a garage to do or

5    somebody, even a friend, you could ask for a gate pass to

6    get in.

7    Q.    Okay.  The gate pass means you can go into where

8    they are all stored?

9    A.    Gate pass gives you -- actually they would tell

10   you what is available and you're allowed to get what's

11   available, and you tell them exactly what you got, and

12   that's how it worked.

13   Q.    And how many occasions after Joe came to work in

14   the shipping department did you need or want shingles?

15   A.    It was just actually it was -- this one was really

16   important to me, and I asked him and asked him and he

17   wouldn't give them to me.  The bad part about it was hauling

18   everyone else's out to them, bringing it to them and they're

19   getting it and I can't get mine.

20   Q.    So was this one time you wanted or needed shingles

21   and had to ask, and you're telling me you had to ask

22   repeatedly?

23   A.    Yes.

24   Q.    Ever provided any further explanation by

25   Mr. Rinderle?

1      A.    No.

2      Q.    Did you have further discussion with him about it?

3      A.    He just kept saying that I was going to get them,

4  I was going to get them.  The only thing I got was fired.

5      Q.    Did you have any discussion with anybody else at

6  GAF MC about that?

7      A.    When you are hauling them over for people you can

8  see them taking them -- so.

9      Q.    I should have been more specific, Mr. Knight.  Did

10 you have any discussion with anyone else at GAF MC about you

11 not getting shingles?

12     A.    No.  Joe was my immediate supervisor.

13     Q.    Are you aware of anyone else that didn't receive

14 shingles when he or she asked?

15     A.    No.

16     Q.    Whether they got them or they didn't?

17     A.    (Witness moved head side to side.)

18     Q.    Do you know of any other instances where someone

19 else requested shingles and they didn't get them?

20     A.    Not that I know of.

21     Q.    The overtime that you would have there was again

22 some allegations about no overtime or less overtime in your

23 original and First Amended Complaint, is that connected to

24 fewer long-distance runs?

25     A.    Yes.

1    Q.    Is there other overtime about --

2    A.    No.

3    Q.    -- which I don't know?

4    A.    No.

5    Q.    Prior to June 26 of 2002 when you had to be out

6    for a day taking vacation, taking a personal day, what was

7    the procedure you would follow to report that or --

8    A.    Call or tell Joe.

9    Q.    -- to approve that?

10    A.    I mean, you could tell him, hey, I need such and

11    such off or you could call him and tell him.  But as far as

12    an emergency goes, you could call and tell him that morning

13    and say, hey, I'm not going to make it or something come up

14    and reg come in, whatever.

15    Q.    It would be specifically Joe as your supervisor

16    that --

17    A.    Yes.

18    Q.    -- you would need to speak with?

19    A.    Yes.

20    Q.    And then would Joe, whether it be by phone call or

21    a few days prior you asking, he would give the approval or

22    disapproval for that?

23    A.    Yes.

24    Q.    Did he ever indicate at any time that he needed to

25    confer with someone else about that?

1    A.    No.

2    Q.    Had he at any time ever declined your request?

3    A.    That day.

4    Q.    Prior to June 26th of 2002?

5    A.    No.   I don't believe I ever asked.

6    Q.    You weren't off work at any time when Joe was your

7    supervisor?

8    A.    No.   I can't recall anytime I took off work,

9    period.

10    Q.    Were there any issues with regard to tardiness

11    while you were assigned to GAF MC?

12    A.    Not that I can remember.

13    Q.    Is there anyone else with whom you compare

14    yourself as far as how you were treated at GAF MC?   We

15    talked about Mr. VanCise being late, per your testimony, and

16    suffered no penalty, and the assignment of long-distance

17    runs.   Is there anyone else with whom you compare yourself

18    or is it limited really to these lease drivers?

19    A.    How can you compare yourself to someone else other

20    than a lease driver?

21    Q.    All right.   Mr. Knight, in some of the materials

22    you submitted to Equal Employment Opportunity Commission you

23    made reference to the telephone call that we talked about

24    which you made to Joe Rinderle while you were still at the

25    courthouse.

1    A.    Um-hmm.

2    Q.    You stated, I have proof of this call.  Can you

3    tell me what you mean by that?

4    A.    Marty Davis is at the sheriff's department and he

5    recalls the conversation, so I have proof of the call.

6    Q.    What office was the call made out of?

7    A.    Sheriff's office.

8    Q.    The sheriff's office, and he was there with you?

9    A.    Yes.  He dialed the number.

10    Q.    I take it then you have spoken with him since that

11    time?

12    A.    Marty, yes.

13    Q.    And he has advised you that he remembers you

14    making the phone call?

15    A.    Yes.

16    Q.    Was he also on the line with you with

17    Mr. Rinderle?

18    A.    Was he on the line?

19    Q.    Did he have another telephone, was it a three-way

20    conference call?

21    A.    No.

22    Q.    The telephone call was just yourself and

23    Mr. Rinderle?

24    A.    Right.

25    Q.    Not on speaker phone?

1        A.    Right.

2        Q.    What else, if anything, has Marty told you about

3    what he recalls?

4        A.    That he recalls the phone call.  He said he gave

5    me a call to contact my employer, he did that.  He remembers

6    me talking to my employer.

7        Q.    He was not privy to what was exchanged between you

8    and Mr. Rinderle, I assume?

9        A.    He couldn't hear the other side, no.

10       Q.    Mr. Knight, what time did you make --

11   approximately what time did you make that phone call to

12   Mr. Rinderle?

13       A.    About 9:00 in the morning.

14       Q.    What time did you tell me the hearing began?

15       A.    8:30.

16       Q.    Which is extraordinary for the court for the

17   county.

18            MR. McNAIR:  Hardly.  They do revocations at 8:30.

19       Q.    I am surprised they do anything before 9:00.  It

20   started at 8:30?

21            MR. McNAIR:  It's always scheduled --

22       Q.    It started at 8:30?

23       A.    Um-hmm.

24       Q.    How long did it take?

25       A.    All of ten minutes.

1          Q.   Then you believe you called Mr. Rinderle, you

2   said, at 9:00?

3          A.   In that area.

4          Q.   Do you know, Mr. Knight, if another driver was

5   sent by TU to replace you for those two days?

6          A.   I couldn't tell you what happened with those two

7   days.  I know my truck was emptied out by Saturday.

8          Q.   Because that's when you spoke with Roger Ellis and

9   went to the facility?

10         A.   (Witness moved head up and down.)  Yes.

11         Q.   Mr. Knight, you filed or presented a charge of

12  discrimination with the EEOC and cross filed with the PHOC

13  following June of 2002, correct?

14         A.   I don't think it was June, though.

15         Q.   Following.

16         A.   Following, yes, yes.

17         Q.   That was presented, per my view of the documents,

18  those claims were made against GAF Corporation?

19         A.   Yes, and Joe Rinderle.

20         Q.   I didn't see Mr. Rinderle named.

21         A.   I am pretty sure he was.

22         Q.   His name was discussed, but he was not named as a

23  respondent in any of them.

24         A.   I can't remember if it was in the --

25         Q.   I am just asking about your recollection, we can

1    certainly go back and take a look.

2         A.   I know I filed it.  I can't remember exactly how I

3    wrote the filing.

4         Q.   Okay.  That was just on one occasion with respect

5    to each agency, right?  You didn't file multiple charges?

6         A.   I filed with the EEOC, I don't know where that PRC

7    or whatever came out.

8         Q.   They cross file frequently.  You filed -- my

9    question is you filed once, one charge, correct?

10        A.   What do you mean one charge?

11        Q.   Versus multiple times going back and filing

12   multiple charges.

13        A.   I filed once, yes, for multiple incidents.

14        Q.   Yes.  Per my review of the file, the EEOC filings

15   and everything, it is my understanding that they advised you

16   that GAF MC was not your employer and not the proper

17   respondent in the matter and they issued to you a dismissal

18   and notice of right to sue in court; is that right?

19             MR. McNAIR:  Wait a minute.  You're asking for a

20             legal opinion so I object to that.  If you look at

21             the dismissal, it says that they were not able to

22             develop sufficient evidence.

23        Q.   Let me go back, Mr. Knight --

24             MR. McNAIR:  And I don't see what this has to do

25             with this particular case.