|    |   |   |
|----|---|---|
| 1  |   | MS. BECK: I appreciate you confusion, Tim, but I |
| 2  |   | will go ahead and finish up. |
| 3  |   | MR. McNAIR: Okay. Well, just quit trying to get |
| 4  |   | legal opinions out of the guy. |
| 5  | Q. | Mr. Knight, what is your understanding of what the |
| 6  |   | EEOC decided? |
| 7  |   | MR. McNAIR: Objection, you're asking for a legal |
| 8  |   | opinion. |
| 9  | Q. | What did the EEOC do? |
| 10 | A. | They did an investigation. |
| 11 | Q. | Then what did they do? |
| 12 | A. | They sent me a letter. |
| 13 | Q. | What did it say? |
| 14 | A. | What did it say? It said that -- and my |
| 15 |   | understanding was that there's a gray area because of the |
| 16 |   | employment situation, and that I would have to go to federal |
| 17 |   | court to get it straight. |
| 18 |   | (DEFENDANT'S EX. 11 - DISMISSAL AND NOTICE OF |
| 19 |   | RIGHTS, marked for identification.) |
| 20 | Q. | Okay. I will show you what we will mark as 11, |
| 21 |   | three pages. This is a letter directed to you from the |
| 22 |   | EEOC, is that what you are talking about, Mr. Knight? |
| 23 |   | MR. McNAIR: Three pages? |
| 24 |   | MS. BECK: No, but the attachments are. |
| 25 | Q. | Is that your address, the Waterford address, is |

```
 1   that your correct address?
 2        A.    Yes.
 3        Q.    That was your address in August of 2003?
 4        A.    Yes.
 5              MR. McNAIR:  Are you saying he should have dropped
 6        his claim because --
 7              MS. BECK:  Tim, I am not going to argue with you.
 8        This is a discovery deposition.  I am going to ask
 9        him my questions.
10              MR. McNAIR:  Well, you're prodding him for
11        conclusions of law.
12              MS. BECK:  You haven't even heard my question.  Do
13        you want to hear it?
14              MR. McNAIR:  I would love to hear it.
15        Q.    Mr. Knight, did you review this letter?
16              MR. McNAIR:  Don't get short with me.
17              MS. BECK:  That's rich.
18        A.    What's that?
19        Q.    Did you receive this letter?
20              MR. McNAIR:  Again, don't get short with me.
21        A.    Yes, I did.
22        Q.    Did you receive the two attachments of the letter,
23   dismissal notice of rights and then the document -- well,
24   let me ask you one at a time.  Did you receive the dismissal
25   and notice of rights?
```

1   A. Yes.

2   Q. And then the filing suit under Title VII of the
3   Civil Rights Act or the Americans with Disabilities Act?

4   A. Yes.

5   Q. It would appear those were directed to you per the
6   address -- per your address in Waterford; is that right?

7   A. Yes.

8   Q. You received those there?

9   A. Yes.

10  Q. Mr. Knight, did you have -- did you have at any
11  time an employment contract with Transportation Unlimited, a
12  contract where they provided that they would employ you and
13  they signed it, you signed it, any sort of contract?

14      MR. McNAIR: A written employment agreement?

15      MS. BECK: Yes.

16  A. I don't know what you mean actually.

17  Q. Do you recall anything like that where an
18  employment agreement outlined the terms of your employment
19  and you agreed and signed and they agreed and signed, versus
20  just being hired by an employer at will?

21  A. I'm kind of in the gray area what you are asking.
22  You are asking that one part -- that one paper you had
23  earlier had both of us sign both sides.

24  Q. The application?

25  A. The application had both sides at the same time.

1      Q.   Let me back up, because it is a fair answer to my
2 question that you don't know what an employment agreement
3 is, so when I ask you did you have an employment contract or
4 employment agreement with Transportation Unlimited, if you
5 don't know you can tell me that.
6      A.   I can't remember if I do or not.
7      Q.   Would the same apply with regard to GAF MC, do you
8 know if you had -- did you have an employment agreement or
9 employment contract with GAF MC?
10     A.   What you're saying, okay, on what I did, my
11 application, I did it at GAF.  It had Transportation Limited
12 (sic) on the heading, so if that's what you are asking for
13 as far as an employment agreement, I had one.
14     Q.   Okay.  Again, this actually is getting into the
15 area that Mr. McNair was talking about about conclusions of
16 law because I'm not asking whether you were employed at will
17 or not.  Do you know what an employment agreement or
18 employment contract is?
19     A.   No.
20     Q.   Okay.  Fair enough.  Were you ever formally
21 discharged or let go by Transportation Unlimited?
22     A.   No.
23     Q.   Could you actually call them up tomorrow and say
24 assign me someplace?
25     A.   I could, but I don't know where it would get me.

154

```
 1       Q.   In terms of actual location?
 2       A.   Yes.
 3       Q.   But technically --
 4       A.   I was never.
 5       Q.   Never discontinued the employment relationship.
 6  You never quit and they never fired you?
 7       A.   Yes.
 8       Q.   Mr. Knight, you make, in addition to Title VII and
 9  a PHOC claim, which is racial discrimination claims, in your
10  Complaint you make a Section 1981 claim, which provides that
11  all persons will have the same right to make and enforce
12  contracts as well as a number of other rights as enjoyed by
13  Caucasian citizens.  Can you tell me or do you have an
14  understanding of what contracts you have been prevented from
15  making or enforcing?
16       A.   That would be -- doesn't have to be per se a
17  contract, I would say it would be treated equally in every
18  aspect in the work environment.  I think that is a basic
19  contract overwritten in any workplace.
20       Q.   That's what Title VII does, this is a separate
21  claim, and you might not know.
22            MR. McNAIR:  If GAF interfered with your
23            employment with Transportation Unlimited.
24            THE WITNESS:  Sure, they fired me.
25            MR. McNAIR:  Next question.
```

```
1      Q.   Did they employ you?
2      A.   Of course they employed me.  If I had to answer to
3  every aspect of my job, that's employment.
4      Q.   But you were still actually employed by TU?
5      A.   They fired me from their lease contract.
6      Q.   You actually were still employed by TU
7  technically?
8      A.   Yes.
9           MR. McNAIR:  That would be a legal conclusion
10          again so.
11          MS. BECK:  I need a five-minute break.
12          (Brief recess.)
13     Q.   Mr. Knight, just a few more questions and that
14 will wrap up my questions at least today.  We had talked
15 some about the gate pass that you needed or that was
16 required to obtain shingles.
17     A.   Um-hmm.
18     Q.   Was that -- who gave the gate pass to you?
19     A.   Who would give it to me?
20     Q.   Yes.
21     A.   You could go up and get it from, I can't think of
22 his name now, but you could go up and get from up in the
23 office area.  And then you have to get it signed by
24 everybody, supervisors, different supervisors, and then you
25 would be legally okay to get it.
```

```
 1     Q.    So it had to be fully completed --
 2     A.    Yes.
 3     Q.    -- before it was effective?
 4     A.    Yes.
 5     Q.    Was it fully completed?
 6     A.    Yes.
 7     Q.    Whose signatures were on it?
 8     A.    Everybody that was needed for the gate pass.
 9     Q.    Do you recall who that is?
10     A.    I can think of their names.
11     Q.    Any of them?
12     A.    Reg think of their names.  I would be giving you
13  the wrong names, but it was fully completed.
14     Q.    How many signatures?
15     A.    I think there were four, I believe.  I'm not sure,
16  it's been a couple years since I seen one.
17     Q.    Did you speak with Ken Joint at any time about not
18  receiving your shingles with a fully completed gate pass?
19     A.    No, I don't believe so.  I might have, reg
20  remember.
21     Q.    That is something that you picked up in the office
22  and circulated for the signatures?
23     A.    Yes.
24     Q.    And it's your testimony that it was fully
25  completed?
```

```
 1      A.   It was fully completed.
 2      Q.   The telephone call that you made from the
 3  sheriff's office on June 26, 2002 that we talked about, did
 4  you tell Joe Rinderle that you were incarcerated or
 5  imminently to be incarcerated?
 6      A.   No.
 7      Q.   Did you tell him where you had to be the next
 8  couple days?
 9      A.   He never asked.
10      Q.   Did you tell him where you had to be the next
11  couple days?
12      A.   No, he never asked.
13      Q.   You just told him you needed a couple days off?
14      A.   He knew where I was going, he knew where I left
15  for.
16      Q.   He knew you were going to --
17      A.   Courthouse.
18      Q.   For a hearing?
19      A.   For a hearing.
20      Q.   You didn't tell him, I have to be in jail the next
21  couple of days?
22      A.   My exact words were, I kind of -- I'm kind of in a
23  bad situation.  I need two days off.  And that would kind
24  of -- if you -- without saying that would tell you what was
25  going on.
```

```
 1        Q.    At that time Judge DiSantis had said it would be
 2   two days.
 3        A.    Two days.
 4        Q.    The hearing had already taken place and you
 5   already knew how long it would be?
 6        A.    Yes.
 7        Q.    That's right?
 8        A.    Yes.
 9        Q.    Did you communicate to Mr. Rinderle that it would
10   be -- that you knew for sure it would be two days?
11        A.    I told them that, yes.  I asked for two days off,
12   and I showed up for work on Saturday.
13        Q.    The two occasions on which you have testified Joe
14   Rinderle made reference or called you little black Joe, was
15   either time on a weekend?
16        A.    He wasn't there on the weekends.
17        Q.    So is that probably not or no?
18        A.    Probably not because he was never there on a
19   weekend.  It was very rare that Joe was there on the
20   weekends.
21        Q.    The reference by Tim Maisner, I believe to the
22   Polish term for a black man, it was Tim Maisner?
23        A.    Yes.
24        Q.    You had said that took place several times.  Did
25   you hear that reference by Mr. Maisner at any time before
```

1  Joe was your supervisor?
2      A.   I couldn't tell you if I did or not.  I remember
3  hearing it and hearing it and hearing it.  I finally asked
4  him what it was and he explained it to me.
5      Q.   Did he ever make this reference or statement in
6  front of Joe Rinderle?
7      A.   Yeah.
8      Q.   Do you know whether Joe Rinderle spoke to him
9  about it, addressed that?
10     A.   I doubt it, but I couldn't tell you.
11     Q.   You don't know?
12     A.   No.
13          MS. BECK:  Those are all the questions I have.
14          Thank you for your time.
15          MR. McNAIR:  I have a couple questions.
16
17                    CROSS-EXAMINATION
18 BY MR. McNAIR:
19
20     Q.   You were asked about whether or not GAF had
21 anti-discrimination policy, and I think you said you thought
22 they did?
23     A.   Right.
24     Q.   Did you ever see such a policy?
25     A.   Not that I can recall.

160

```
 1      Q.   Was any policy posted anywhere on the premises at
 2 GAF?
 3      A.   Not that I can recall.
 4      Q.   Were you ever given an employee handbook
 5 containing that policy from GAF?
 6      A.   Not that I recall.
 7      Q.   Were you ever given any type of instructions about
 8 the correct manner to lodge a complaint if you had a
 9 complaint of unequal treatment or discrimination?
10      A.   Not that I can recall.
11      Q.   After the initial incident you made a complaint to
12 Ben Clement?
13      A.   Yes.
14      Q.   And at that time he was your supervisor?
15      A.   Yes.  Well, it could have been a gray area.  Joe
16 might have been there, Ben might be on his way out, but I
17 suppose you can still say he was a supervisor.
18      Q.   Did he satisfactorily resolve your complaint?
19      A.   Well, he listened to me.
20      Q.   Did he take any action or do anything with regard
21 to any other employees to alleviate the concerns you raised
22 in your Complaint?
23      A.   No, not really.
24      Q.   When you were confronted with comments by
25 Mr. Rinderle, were you ever informed of the proper avenue to
```

```
 1   lodge a complaint if you --
 2        A.   No.
 3        Q.   Did you feel under those circumstances you could
 4   complain to Mr. Rinderle?
 5        A.   No.
 6        Q.   Did you know of anyone else who ever filed a
 7   complaint under the nondiscrimination policy of GAF?
 8        A.   Not that I know of.
 9        Q.   Now, while you were working out at the GAF
10   facility here in Erie, who told you what time to show up for
11   work?
12        A.   GAF.
13        Q.   Who told you where you were going to drive?
14        A.   GAF.
15        Q.   Whose material were your hauling?
16        A.   GAF.
17        Q.   Whose equipment were you using?
18        A.   GAF.
19        Q.   Who gave you money to pay your tolls?
20        A.   GAF.
21        Q.   Who paid the expenses of operating your vehicle?
22        A.   GAF.
23        Q.   Was there any part of the operational activities
24   of the shipping and receiving department at GAF that was
25   directed by Transportation Unlimited?
```

```
 1      A.   No.
 2      Q.   You made reference to a time card?
 3      A.   Yes.
 4      Q.   That was issued to you by GAF?
 5      A.   Yes.
 6      Q.   And that has an employee number on it?
 7      A.   Yeah.  I don't know if it's an employee number or
 8 just a time card number that references to you as an
 9 employee.
10      Q.   Who directed you to go to the facility for your
11 drug screen on July 5?
12      A.   Ben did, GAF.
13      Q.   You were not directed to do that by Transportation
14 Unlimited?
15      A.   No.
16      Q.   Did anyone from Transportation Unlimited at any
17 time discuss with you the manner in which you were to
18 perform your job?
19      A.   No.
20           MR. McNAIR:  That's all the questions I have.
21
22                    REDIRECT EXAMINATION
23 BY MS. BECK:
24
25      Q.   Mr. Knight, who was Joe Rinderle's superior?
```

```
 1        A.    Ken Joint, as far as I understood it.
 2        Q.    He was located or was he located here at the
 3   facility on Bayfront Highway?
 4        A.    Yeah.
 5        Q.    Is he someone whose name you knew when you were
 6   working at GAF MC?
 7        A.    Yes.
 8        Q.    You never approached him with any complaints
 9   regarding Joe Rinderle; is that correct?
10        A.    I never complained, period.
11              MS. BECK:   That's all I have.  Thank you.
12
13                       RECROSS-EXAMINATION
14   BY MR. McNAIR:
15
16        Q.    Did you know you could have approached Mr. Joint
17   with the same complaint that you presented to Mr. Clement
18   and have that claim satisfactorily and effectively resolved?
19        A.    I was never told there -- there was no this is
20   what happens if you do this, there was no per se emergency
21   exhibit routine, you know.  I mean, you kind of had to go
22   with the flow.
23              MR. McNAIR:   That's all.
24
25
```

```
 1                FURTHER REDIRECT EXAMINATION
 2   BY MS. BECK:
 3
 4        Q.   Mr. Knight, it never occurred to you to complain
 5   to any superiors of any of these people about the comments
 6   or conduct?
 7             MR. McNAIR:  Object to the relevancy of the
 8             question.
 9        Q.   Did it ever occur to you?
10        A.   To tell you the truth, I could live with it as
11   long as I had my job, but once I lost my job it was
12   unlivable, know what I mean?
13        Q.   I'm sorry, your answer it was okay -- or was
14   liveable as long as you had your job?
15        A.   Yes.
16        Q.   So you did not consider making any complaint?
17        A.   I considered it, but it was an area where I just
18   had kind of like put up with it because I was at a spot
19   where I was making the money I could and just --
20        Q.   Okay.  So then the first formal complaint was made
21   after your work at GAF MC was discontinued?
22        A.   Yes.
23             MS. BECK:  I don't have anything further.
24             Mr. Knight, you have a right to review the
25             transcript and 30 days in which to do so or waive
```

165

1           that right.
2               MR. McNAIR:  He'll read.  I do have one more
3           question.
4
5                     FURTHER CROSS-EXAMINATION
6   BY MR. McNAIR:
7
8       Q.  Were you concerned, David, that if you did
9   complain about your treatment that you might be subjected to
10  retaliation and lose your employment?
11      A.  Yes.
12      Q.  How much were you making there on an annual basis?
13      A.  Around $50,000.
14      Q.  How much are you making now?
15      A.  Around $20,000.
16          MR. McNAIR:  That's all.
17
18                    FURTHER REDIRECT EXAMINATION
19  BY MS. BECK:
20
21      Q.  Mr. Knight, that money question, I just have a
22  quick follow up.  Do you know what you could be making for
23  Transportation Unlimited if you relocated?
24      A.  I have no idea.
25      Q.  Would that depend on the location?

1    A.    I have kids here, I am not going to leave them.
2    Q.    That wasn't my question, sir. Would that depend
3 on the location?
4    A.    That would depend on the location.
5    Q.    And I understand you were making quite a bit more
6 at Railco than you are at Cycle City; is that right?
7    A.    Yes.
8    Q.    It was your decision for personal reasons, family
9 reasons, to make that change, correct?
10         MR. McNAIR:  Object to the leading form of the
11         question.
12   Q.    Was it your decision based on family and personal
13 reasons to make that change?
14         MR. McNAIR:  Object to the leading form of the
15         question.
16   A.    Yes.
17         MS. BECK:  That's all I have.
18
19              FURTHER CROSS-EXAMINATION
20 BY MR. McNAIR:
21
22   Q.    Was your employment at Railco comparable to your
23 employment at GAF?
24   A.    Nowhere close. When you're gone for a week at a
25 time it's not even close to being home every night.

167

1          (Examination concluded at 1:47 p.m.)
2                      *   *   *
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                C E R T I F I C A T I O N
 2
 3
 4        I, Linda K. Rogers, Shorthand Reporter and
 5   Commissioner of Deeds in and for the Commonwealth of
 6   Pennsylvania, do hereby certify that I recorded
 7   stenographically the proceedings herein at the time and
 8   place noted in the heading hereof, and that the foregoing is
 9   an accurate and complete transcript of same to the best of
10   my knowledge and belief.
11
12
13
14
15
16
17                    [signature: Linda K Rogers]
18
19                         Linda K. Rogers
20
                                     Linda K. Rogers
21                                Comonwealth Of Pennsylvania
                                     Commissioner Of Deeds
22   Dated:  April 8th, 2005        My Commission Expires 11/1/14
23
24
25
```

```
 1                              INDEX

 2                           EXAMINATION

 3  WITNESS NAME                                        PAGE   LINE

 4    DAVID KNIGHT.......................................  2     1

 5      Direct By Ms. Beck...............................  2     5
        Cross By Mr. McNair.............................. 160    18
 6      Redirect By Ms. Beck............................. 163    23
        Recross By Mr. McNair............................ 164    15
 7      Redirect By Ms. Beck............................. 165     1
        Recross By Mr. McNair............................ 166     6
 8      Redirect By Ms. Beck............................. 166    19
        Recross By Mr. McNair............................ 167    20
 9

10                             EXHIBITS

11                    DESCRIPTION                        PAGE   LINE

12    EX.  1      APPLICATION............................  38    25
      EX.  2      DRUG TESTING...........................  44    22
13    EX.  3      DRIVER'S RECEITS.......................  44    23
      EX.  4      NOTICE TO DRIVER.......................  45    16
14    EX.  5      REQUEST FOR INFORMATION................  46    18
      EX.  6      PREVIOUS EMPLOYER......................  47    24
15    EX.  7      AUTHORIZATION FOR RELEASE..............  49    13
      EX.  8      MEDICAL REVIEW.........................  51    13
16    EX.  9      MEDICAL REVIEW.........................  52    15
      EX. 10      8/23/00 LETTER.........................  64    20
17    EX. 11      DISMISSAL AND NOTICE OF RIGHTS......... 151    18

18

19

20

21

22

23                            *   *   *

24

25
```